SUPERIOR COURT 
 
 SHANNON O'BRIEN v. DEBORAH GOLDBERG[1]

 
 Docket:
 2484CV03009-C
 
 
 Dates:
 September 2, 2025
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS
 
 

 
            Plaintiff Shannon O'Brien ("O' Brien" or "Plaintiff') brought this action in the nature of certiorari under G.L. c. 249, § 4, challenging the decision of Defendant Deborah Goldberg, Treasurer and Receiver General of the Commonwealth of Massachusetts ("Defendant" or the "Treasurer"), to remove O'Brien as Chair of the Cannabis Control Commission (the "CCC"). Before the Court is Plaintiff's Motion for Judgment on the Pleadings and the Treasurer's Cross- Motion for Judgment on the Pleadings. After a hearing and review of the nearly 3,000-page Administrative Record, and for the reasons which follow, Plaintiff's Motion shall be
ALLOWED and Defendant's Motion shall be DENIED.
            The Legislature established the CCC, reasoning that the public interest would be best served by placing the administration and regulation of the Commonwealth's legalized cannabis industry in the hands of an independent commission. To preserve this independence, the Legislature enumerated limited grounds upon which the Chair (and other commissioners) of the CCC may be removed from office. Sec G.L. c. 10, § 76(d). The question before the Court is not whether the Plaintiff was abrasive, boorish, inconsiderate, ill-tempered, imprudent and/or
 
--------------------------------------------
 
[1] Treasurer and Receiver General of the Commonwealth of Massachusetts, in her official capacity.
 
                                                            -1-
 

otherwise unreasonable - either in actuality or in the reasonable estimation of the Treasurer. Those are simply not grounds that clear the high bar for removal set by the terms of the statute. Rather, the question presented is whether the Treasurer's removal decision (the "Decision")- which concluded that O'Brien both committed "gross misconduct" and was ''unable to discharge the powers and duties" of the Chair - properly applied those statutory terms and was supported by substantial evidence on the record. On any fair reading of the facts, and any proper application of the law, the Decision fails on both counts.
            First, O'Brien's actions did not constitute "gross misconduct" under G.L. c. 10, § 76(d)(4) or any heretofore recognized construction of the term. Second, and contrary to the Treasurer's interpretation, removal under G.L. c. 10, § 76(d)(3) required a showing that O'Brien was unable to discharge the powers and duties of her office because of a physical or mental incapacity, an actual absence from the job, or the functional equivalent of either. No such evidence was presented to the Treasurer or this Court. Accordingly, Plaintiff is entitled to reinstatement for the remainder of her statutory appointment, and to an award of back pay and benefits running from the date of her unlawful termination.
BACKGROUND
I. STATUTORY FRAMEWORK
            On November 8, 2016, Massachusetts voters approved "Ballot Question 4," which called for legalization of the production, distribution and adult recreational use of marijuana, subject to an administrated system of licensing, regulation and taxation. In accordance with that ballot approval, the Legislature enacted the Regulation and Taxation of Marijuana Act (the "statute"). This legislation established the CCC to administer the licensing, taxation and regulation of the newly legalized cannabis industry, and to enforce all related laws and regulations. See St. 2016, 
 
                                                            -2-
 
c. 334, §§ 1-12 (Dec. 15, 2016), codified as G.L. c. 10, §§ 76, 77, G.L. c. 64N, §§ 1-5, G.L. c. 94G, §§ 1-14.
            As initially constituted, the CCC consisted of a commissioner and two associate commissioners, each appointed and subject to removal by the Treasurer "for neglect of duty, misconduct or malfeasance in office[.]" St. 2016, c. 334, § 3.[2] Within a year, however, the Legislature amended the statute, and thereby divested the Treasurer of certain powers of appointment and removal. See G.L. c. 10, § 76(a). The 2017 amendments expanded the CCC from three commissioners to five, the reconfigured body to consist of a Chair appointed by the Treasurer, one commissioner appointed by the Governor, one commissioner appointed by the Attorney General, and two commissioners appointed by majority vote of the Governor, Treasurer and Attorney General (together, the "Appointing Authorities"). Id. No more than three of the commissioners may be from the same political party. G.L. c. 10, § 76(b).[3] The amendments also tightened the standard for mid-term removal, providing that the CCC's Chair and commissioners may be discharged by their respective Appointing Authority(ies) only if he/she:
(1) is guilty of malfeasance in office;
(2) substantially neglects the duties of a commissioner;
(3) is unable to discharge the powers and duties of the commissioner's office;
(4) commits gross misconduct; or
(5) is convicted of a felony.
G.L. c. 10,§ 76(d). "Before removal, the commissioner [must] be provided with a written statement of the reason for removal and an opportunity to be heard." G.L. c. 10, § 76(d). Barring
 
--------------------------------------------
 
[2] Goldberg has been the only person to serve as Treasurer since the inception of the CCC.
[3] Commissioners are also prohibited from holding or being a candidate for elected office, from holding another appointed governmental office, and/or from serving as an official in a political party. See G.L. c. 10, § 76(b). The commissioners and employees of the CCC are likewise subject to G.L. c. 268A (Conduct of Public Officials and Employees) and c. 268B(Financial Disclosure by Certain Public Officials and Employees), as well as a code of ethics"more restrictive than said chapters," which the CCC is required to promulgate in order to preclude even potential conflicts of interest.
 
                                                            -3-
 
proper removal, each commissioner is entitled to serve for a term of five years, and may be reappointed for one additional, five-year term. G.L. c. 10, § 76(c).[4]
            Per the statute, the Chair must "have experience in corporate management, finance or securities[.]" G.L. c. 10, § 76(a). The Chair thus qualified is empowered and tasked with exercising "supervision and control over all the affairs of the [CCC]," including "rnak[ing] such division or re-division of the work of the commission among the commissioners as the chair deems expedient" to "promote efficiency in administration" of the CCC and its statutorily prescribed duties. G.L. c. I0, § 76(h). The Chair presides at all hearings of the CCC, or must otherwise designate a commissioner to act as chair in his/her absence. G.L. c. 76, § 1O(h). The Treasurer has described the Chair as both a policymaker and the public face of the CCC. (Admin. Record ("A.R.") at 20.)[5]
            The CCC's duties include administering a "Social Equity Program" and promulgating policies, procedures and regulations "to promote and encourage full participation in the regulated marijuana industry by people from communities that have previously been disproportionately harmed by marijuana prohibition and enforcement ... [.]" G.L. c. 94G, §§ 3(d)(5), 4(a½)(iv), 22. The Social Equity Program provides "(I) technical assistance and training; and (ii) guidance on how to access funds available ... to individuals certified by the commission as economic empowerment priority applicants and that meet other criteria determined by the [CCC]." G.L. c. 940, § 22. The Cannabis Social Equity Trust Fund (the "Fund"), in turn, provides "grants and loans, including no-interest loans and forgivable loans," to eligible applicants. See G.L. c. 94G, §
 
--------------------------------------------
 
[4] To the extent a commissioner resigns or is removed prior to the expiration of his/her term, "[a] person appointed to fill [the] vacancy ... shall be appointed in a like manner and shall serve for only the unexpired term of that commissioner." G.L. c. 10, § 76(c).
[5] Citations to the "A.R." and "Supplemental A.R." refer to the redacted versions of Administrative Record Volumes I-V and Supplemental Volumes I-II, as filed on July I, 2025, in compliance with the Court's Orders of June 4, 2025 (Dkt. Nos. 67 and 68).
 
                                                            -4-
 
14A(b).[6] The Legislature has further directed the CCC to "prioritize social equity program businesses and economic empowerment priority applicants ... [.]"G.L. c. 94G, § 4(a)(xxx).
            The CCC is required to appoint an executive director to serve as the "executive and administrative head of the [CCC] and ... [to] be responsible for administering and enforcing the law relative to the commission and to each administrative unit thereof." G.L. c. 10, § 760). The executive director "serve[s] at the pleasure" of the commissioners, and must "devote full time and attention to the duties of the office." Id. In the event of an absence or vacancy of the executive director, or in the case of a disability as determined by the commissioners, the commissioners may designate an acting executive until the vacancy is filled or the absence or disability abates. Id.
II. FACTUAL AND PROCEDURAL BACKGROUND
            Pursuant to her authority under G.L. c. 10, § 76(a), the Treasurer appointed O'Brien to serve as Chair on August 30, 2022, and O'Brien's five-year term commenced on September 1, 2022.[7]
            A. Complaints Against and Suspension of O'Brien
            In or around early 2023, the CCC's human resources department received cross-
--------------------------------------------
 
[6] The Fund was established "to encourage the full participation in the commonwealth's regulated marijuana industry of entrepreneurs from communities that have been disproportionately harmed by marijuana prohibition and enforcement." Stat. 2022, c. 180, § 9, codified as G.L. c. 94G, § l4A(a). The Fund is administered by the Executive Office of Housing and Economic Development, "in consultation with" the Cannabis Social Equity Advisory Board, the membership of which is to include experts in social welfare or social justice, criminal justice reform to mitigate the disproportionate impact of drug prosecutions on communities of color, and minority business ownership, respectively. Sec G.L. c. I0, § 77(a)(setting forth designated members of the Board and the qualifications required of individuals appointed thereto by the Governor, the Attorney General, and the Treasurer).
[7] The first Chair of the CCC, Steven Hoffman, resigned on or about April 25, 2022, a few months before his term was to expire on August 30, 2022. (A.R. at 757.) See Dan Adams, Hoffman resigns as chair of Mass. Cannabis Control Commission, Boston Globe (May 2, 2022) available at https://www.bostonglobe.com/2022/05/02/marijuana
/hoffman-resigns-chair-cannabis-control-commission/. The Treasurer appointed an interim Chair to complete the remainder of Hoffman's term prior to appointing O'Brien. (See A.R. at 1098); Commonwealth Staff, Hoffman's abrupt exit at cannabis commission remains a mystery, Commonwealth Beacon, (May 13, 2022), available at https:
//commonwealthbeacon. org/the-download/hoffmans-abrupt-exit-at-cannabis-commission-remains-a-mystery-2/.
 
                                                            -5-
 
complaints from O'Brien and Chief Communications Officer Cedric Sinclair, each alleging harassment, bullying and discrimination against the other.[8] The CCC, through its outside counsel, [9] engaged Attorney Kimberly Jones to investigate the allegations, as well as a subsequent complaint by CCC Commissioner Nurys Camargo alleging that O'Brien had made racially biased and/or racially motivated statements that made Camargo "personally and professionally uncomfortable."(A.R. at 1108.) Attorney Jones thereupon interviewed O'Brien; Sinclair; Camargo; the CCC's Chief of Investigations and Enforcement, Yaw Gyebi; and five other CCC staff members who cooperated in the inquiry on the assurance of anonymity. (A.R. at 1096.) In September, 2023, Attorney Jones issued a report (the "Jones Report"), in which she concluded that O'Brien's and Sinclair's allegations of discrimination against one another were not supported. Attorney Jones noted, however, that O'Brien had used the term "yellow" to refer to persons of Asian descent during a CCC meeting. The report also found that O'Brien had (1) referred to Sinclair as Commissioner Camargo's "buddy,'' despite requests from Camargo that
she cease doing so; and (2) suggested that Commissioner Camargo likely knew a local politician, who also happens to be a woman of color.
            In late July, 2023, the CCC's Executive Director, Shawn Collins, complained to the CCC's Chief People Officer[10] that O'Brien had threatened to fire him, attempted to force him to resign, interfered with his parental leave rights, and disclosed personal and confidential information about him, including during a public meeting held on July 28, 2023. At or about the same time, O'Brien's executive assistant, Grace O'Day, complained that O'Brien had berated
--------------------------------------------
 
[8] O'Brien alleged that Sinclair discriminated against her based on her gender, whereas Sinclair, who identifies as black, alleged that O'Brien discriminated against him based on his race.
[9] Morgan, Brown and Joy LLP
[10] The title of CCC's head of human resources
\
                                                            -6-
 
her on July 27, 2023 for failing to prepare a scripted agenda for that day's public meeting.
            The Treasurer reviewed the video-recording of the July 28 public meeting and, on July 31, 2023, informed O'Brien that she was troubled by her conduct. The Treasurer further suggested that O'Brien should consider whether, in light of these events, it was appropriate for her to continue in office as Chair. At the outset of the CCC's next public meeting on August 10, 2023, O'Brien read a prepared statement in which she apologized to her fellow commissioners for the manner in which she had raised the issue of Collins' impending leave (the subject of the Executive Director's objections), but stated that she believed she was statutorily obligated to do so. (AR. at 1951, Recording of Public Meeting, Aug. 10, 2023 at 0:01:31-00:08:56.) Before the meeting, O'Brien also apologized to O'Day for her acknowledged "impatience" with her on July 27. (A.R. at 1232.)
            On August 31, 2023, Collins' personal lawyer submitted a letter to the CCC's outside counsel, further detailing his grievances against O'Brien. Thereafter, the CCC's outside counsel retained Attorney Tracey Spruce to investigate the allegations made by Collins and O'Day.
            Following her receipt of the Jones Report and Collins' complaints, and with Attorney Spruce's investigation still pending, the Treasurer suspended O'Brien with pay on September 14, 2023. On September 28, 2023, O'Brien filed an action for injunctive relief in this Court, No. 2384CV02183, seeking reinstatement or, in the alternative, full notice of the allegations preferred against her and a hearing to defend against the same. On October 4, 2023, the Treasurer notified O'Brien in writing both of the grounds for her suspension and of the fact that she was considering O'Brien's possible removal as Chair of the CCC.
            The Treasurer subsequently promulgated a protocol for a hearing on O'Brien's removal. This Court (Squires-Lee, J.), on O'Brien's motion, issued a temporary restraining order that
 
                                                            -7-
 
enjoined such hearing until Attorney Spruce issued her investigative report and the Court resolved the parties' disputes regarding the procedures required for a removal hearing. See O'Brien v. Goldberg. No. 2384CV02183, Dkt. No. 13 (Mass. Super. Dec. 5, 2023). Thereafter, the Treasurer issued a revised hearing protocol, whereupon the Court (Squires-Lee, J.) denied O'Brien's request for preliminary injunction and dissolved the temporary restraining order that had previously entered. In her decision, Judge Squires-Lee concluded that the revised hearing protocol, closely modeled on procedures set forth in!&Yy v. Acting Governor of the  Commonwealth, No. SJC-2001-0531, Dkt. No. 42 (Dec. 19, 2001) (Greaney, J.), satisfied the requirements of both G.L. c. 10, § 76 and constitutional due process. See O'Brien, No. 2384CV02183, Dkt. No. 10 (Mass. Super. Dec. 22, 2023).[11] Attorney Spruce issued her investigative report (the "Spruce Report") the same day. On March 20, 2024, the Treasurer furnished O'Brien with a revised statement of the reasons for her potential removal, in which statement she incorporated the Jones and Spruce Reports and their supporting documents.
            B. Administrative Hearing
                        1. The Treasurer's Evidence
            O'Brien's administrative hearing was conducted over the course of five sessions between May 2 and June 17, 2024, and consumed more than nineteen hours. In accordance with the hearing protocol, Attorney Thomas E. Maffei presided as the Treasurer's designated Officiant. The Treasurer's legal counsel[12] introduced the Jones and Spruce Reports, as well as additional documentary evidence that included internal CCC correspondence, the CCC Employee Handbook, and video-recordings of the relevant public meetings of the CCC. Attorneys Jones
 
--------------------------------------------
 
[11] O'Brien petitioned for interlocutory review of this ruling by a Single Justice of the Appeals Court, which petition was denied. Sec O'Brien v. Goldberg. No. 2024-J-0032, slip op. (Mass. App. Ct. Feb. 6, 2024) (Hershfang, J.).
[12]Attorneysof the law firm of Morgan, Lewis & Bockius LLP
 
                                                            -8-
 
and Spruce also testified regarding the contents of their respective reports, and were subject to cross-examination. The Treasurer's counsel at hearing did not call either Commissioner Camargo or any of the CCC staff who had leveled allegations against O'Brien, and, under the governing hearing protocol, O'Brien could not compel their appearance or testimony.
            Per the testimony and report of Attorney Jones, Commissioner Camargo conveyed to Jones that O'Brien had repeatedly called her and Sinclair '·budd[ies]," despite Camargo's request that she cease using this particular moniker. Commissioner Camargo believed that O'Brien's use of the appellation may have been racially motivated, because both Camargo and Sinclair identify as persons of color. O'Brien admitted referring to Sinclair as Camargo's "buddy," but denied any racial animus or malign intent. (See AR. at 1108-09; Supplemental AR. Vol. II at 97-103.) Commissioner Camargo also told Attorney Jones that O'Brien had made statements implying that certain individuals likely knew one another, because they shared similar racial/ ethnic backgrounds. Specifically, in March of 2023, O'Brien remarked to Camargo, "I do not know [State Senator] Lydia Edwards, but you probably know her." (A.R. at 1109; Supplemental A.R. Vol. II at 104.) Attorney Jones, who is herself a person of color, additionally noted that, during their interview, O'Brien made like reference to certain politicians, business leaders and other high-profile individuals who have similar demographic backgrounds as Attorney Jones. Separately, Attorney Jones noted a remark by O'Brien regarding an African-American staff member during the interview - "I think she's first generation because she doesn't have a trace of an accent. [She] told me where her family came from, so I'm not sure if she was born here." (A.R. at 1113.) Jones further recalled that O'Brien admitted to commenting, in or around October of 2022, that the CCC's Constituent Services Associates "may not be college grads, but they are articulate." (Id. at 1112.)
 
                                                            -9-
            Commissioner Camargo, who had previously sought without success to be appointed the CCC's Chair, further complained that, in response to a question from an online journalist/ blogger as to why other publicly declared candidates for the position of Chair - all of whom were reportedly persons of color - were unqualified for appointment, O'Brien responded "read the law." (A.R. at 1110.) When Attorney Jones asked O'Brien about this particular comment, O'Brien cited the statutory requirement that the Chair possess a background in business, banking or finance, and noted that she (O'Brien) had all three. O'Brien also told Attorney Jones that Commissioner Camargo "never would have been appointed as Chair, but maybe Commissioner [Ava] Concepcion would." (A.R. at 1110. Sec Supplemental A.R. Vol. II at 83-85.)
            Jones further testified that anonymous staff members had reported that, during an internal meeting held in the Fall of 2022, O'Brien used the term "yellow" when referring to persons of Asian descent, and also purportedly stated, "I guess you're not allowed to say 'yellow' anymore." (A.R. at 1111; Supplemental A.R. Vol. II at 108-09.) O'Brien denied the latter statement, but admitted that she had repeated a statement by a local real estate developer making reference to '<yellow" investors. (A.R. at 1111; Supplemental A.R. Vol. II at 110-12) O'Brien acknowledged that she "should have cleaned it up," and that "[i]t's difficult sometimes to know how to say the right thing." (A.R. at 1111, Supplemental A.R. Vol. II at 109.)
            Per anonymous witnesses, O'Brien also purportedly stated during a 2023 meeting that a staff member of color should be able to talk about [the Dorchester neighborhood of] Upham's Comer.[13] O'Brien likewise stated in an email regarding two new employees of color that she "assum[ed] [they] are in the Boston area," and made comments to staff that she could meet "the new person in Boston." (A.R. at 1111-12; Supplemental A.R. Vol. II at 115-16.) The anonymous
 
--------------------------------------------
 
[13] O'Brien denied any recollection of either the statement or its context.
 
                                                            -10-
 
witnesses reportedly perceived these comments as reflecting a race-based assumption about where persons of color live. At hearing, the Officiant specifically concluded that the uncorroborated statements attributed to anonymous CCC staff members in the Jones Report lacked adequate indicia of reliability and trustworthiness to constitute credible evidence, but nonetheless permitted such statements to remain in the record.
            Attorney Spruce reported that O'Brien had yelled at Collins in the Fall of 2022 because she was angry about the communications staffs handling of questions regarding O'Brien's former affiliation with a cannabis licensee. (A.R. at 1225.) Spruce likewise reported that, in March or April of 2023 (and on other occasions), O'Brien told Collins that he could be terminated from his position at the CCC if his performance did not improve, referring to termination as a "blunt instrument." (A.R. at 1238.) Collins also conveyed to Spruce that O'Brien had told him on various occasions that he was a "terrible" manager, that "this place sucks because of' him, and that O'Brien accused Collins of concealing incompetence among the CCC staff. (Id.)
            On May 22, 2023, Collins informed O'Brien that he planned to announce at that day's public meeting that he intended to take a parental leave beginning in September, and would resign as Executive Director in December of 2023. O'Brien, however, requested that Collins not announce his intentions that day, because the CCC was already conducting searches to fill a number of high-level positions.
            During a July 13, 2023 public meeting, O'Brien expressed her desire that the CCC perform an organizational assessment. When discussing the structure and functions of the CCC, O'Brien made reference to Collins' "personal issues ... in terms of having a new child . . . " (A.R. at 1948, Recording of Public Meeting, July 13, 2023, 02:29:31-2:29:54.) Collins inquired
 
                                                            -11-
 
as to what "personal issues" O'Brien was referring, and O'Brien responded, "No, no, no . . . I think this came to the forefront - not personal, but speaking against the fact that you had a new child - you were out for a couple of weeks and ... figuring out what that line of succession is ... who is doing your job when you're not here." (Id. at 02:29:55-02:30:16.) On July 18, 2023, during a private discussion with Collins, O'Brien made reference to her own, comparatively shorter, parental leave. (A.R. at 125.) O'Brien denied intending this reference as any sort of criticism of Collins' leave-taking. Collins, however, reported that he felt pressured not to take additional leave because of the comment. (A.R. at 125-28, 1237.)
            On July 27, 2023, Collins informed O'Brien that he would take the ten remaining weeks of his parental leave beginning the following Monday, July 31, 2023, and would resign from the CCC thereafter. (A.R. at 1242.) Per the report of Attorney Spruce, Collins initially agreed to announce his intentions at that day's public meeting, but then balked when O'Brien informed  him that she had already been informally seeking candidates to succeed him. (A.R. at 181, 1242- 43.) O'Brien believed that the lack of a formal announcement impeded the  CCC's ability to hire a successor for the Executive Director position. (Id.) At the close of the July 27 meeting, O'Brien and Collins had the following exchange on the public record:
O'Brien: Mr. Executive Director, do you have any comments you'd like to make? 
Collins: No.
O'Brien: Are you making any announcements today? 
Collins: No.
O'Brien: When arc you going to be making your announcement? 
Collins: After I've been able to have discussions with my colleagues. 
O'Brien: Okay. Sounds good.
(A.R. at 1949, Recording of July 27, 2023 Public Meeting, 6:56:15-6:56:35.)
            The following day, the CCC held another public meeting concerning its then-ongoing efforts to draft and promulgate regulations mandated by the Marijuana Reform Act of 2022, St.
 
                                                            -12-
 
2022, c. 180.[14] Toward the end of the meeting, O'Brien raised the subject of"new business," and made comments on the record concerning Collins' earlier statement to her that he intended to
begin his parental leave the following Monday. O'Brien's remarks were, in relevant part, as follows:
"I had a conversation with the Executive Director yesterday, who again indicated to me that he was still- he was about to announce yesterday, which is why I called on him to announce his plans to leave. He further indicated to me that he planned on taking his leave ... his family leave beginning on Monday. . . . I have consulted with labor attorneys and 'employees shall give no less than 30 days' notice to their employer of the anticipated start date of family or medical leave. Notice shall be provided as soon as practicable if delay is beyond an employee's control.' ... I would like to say that I will be notifying - we need to do this with respect to the legal rights of all employees to fully enjoy their family leave -we are in crisis right now as a commission. [] [W]e need to make sure that we know how to manage through this regulatory process [ ] and we need to understand, again, back in May I had actually begun making some inquiries . . . [as to people] who might [ ] want to apply for this position [of executive director]. But I did not want to announce this in May . . . because I wanted to make sure that we got our Chief People Officer in place, we were doing a search for general counsel, we were in the throws of regulatory writing. So, to that extent, I just want to notify my fellow commissioners. I will be sensitive to, I want to protect the rights of all employees of the Commission, but I want to have a conversation with my fellow commissioners to discuss this - to discuss the leave [ ] and [ ] to do that in a way where we have time to prepare, where we properly notify . . . the employee that we will have this conversation, it may require us, to protect [] his rights, to go into executive session. Again, all of that requires advance notification. ...
I am trying to make sure that we meet our responsibilities....I am not asking for any votes. Frankly, I do not think it is appropriate to go beyond what I've tried to say, after having consulted with labor counsel . . . .I don't want to get into the specifics. I just want to notify people that this is a conversation that I hope to have in the coming week or so"
(A.R. at 1950, Recording of Public Meeting, July 28, 2023, at 02:39:10-02:42:31.) Commissioner Camargo responded that she "needed a moment to process, that was a lot. I think a little inappropriate . . . I think it's highly inappropriate."(Id. at 02:42:41-02:42:59.)
 
--------------------------------------------
 
[14] This statute required the CCC to "promulgate regulations to establish minimum acceptable standards for host communities to promote and encourage full participation in the regulated marijuana industry by people from communities that have previously been disproportionately harmed by marijuana prohibition and enforcement and to positively impact those communities[.]" G.L. c. 94G, § 3(d)(5).
 
                                                            -13-
 
Commissioner Concepcion, in turn, suggested that the commissioners should proceed with the more pressing matter of regulatory drafting, and that Collins should be given an opportunity to
consider his response. (Id. at 02:43:25-02:43:55.) O'Brien replied,
" ... I don't think it is inappropriate, I think it is me responding to a statement that was made to me yesterday about beginning the ten-week, paid family leave that he is entitled to, but it creates chaos for us         I would like us, as a commission, to be able to discuss this and make sure that we are dealing with it appropriately."
(Id. at 02:44:08-02:44:38.)
            Finally, Attorney Spruce reported that the interaction between O'Brien and Grace O'Day on July 27, 2023 concerning O'Day's failure to prepare the public meeting agenda had been contentious on both sides. Attorney Spruce concluded, however, that O'Brien had not violated any provisions of CCC's Employee Handbook. (A.R. at 1244-45.)
            2. O'Brien's Evidence
            O'Brien provided a sworn written statement, and additionally testified at hearing subject to cross-examination. O'Brien also submitted documentary evidence, and called Commissioner Kimberly Roy and former CCC Chair Steven Hoffman to testify.
            O'Brien testified that the lone time she might have used the word "yellow" to refer to persons of Asian descent was in repeating the statement of an African-American real estate developer that referred to "a group of black, brown and yellow investors . . . [who) successfully made investments in the Seaport." (AR. at 551). O'Brien testified that she otherwise "never referred to an Asian individual as yellow," and that it represented "a derogatory slur" which was "not part of [her] vocabulary." (Id.) Commissioner Roy corroborated that O'Brien had referred to black, brown, and yellow investors when repeating the statement of a local real estate developer. (A.R. at 731-32.) Roy further testified that O'Brien repeated this statement during an executive session discussion of ways that the CCC could invest in and be more impactful to marginalized
 
                                                            -14-
 
communities in accordance with its social-equity mission. (Id.)
            As for the comment to Commissioner Camargo regarding State Senator Edwards, O'Brien testified that she "thought it was reasonable that" the two"likely crossed paths at some time," because both are "activists and leaders in Boston's communities of color," have been involved in Democratic politics and cannabis policy, and because Camargo resides in Boston where Senator Edwards had previously served on the City Council. (A.R. at 553-54.) O'Brien further testified that she referred to Commissioner Camargo and Sinclair as "buddies" because the two are friends, and because they regularly collaborated on CCC business. (A.R. at 554-55.) O'Brien denied any racial animus in her comments. (A.R. at 555.) O'Brien also asserted that, prior to O'Brien's appointment, Commissioner Camargo had campaigned to succeed the CCC's former Chair, Steven Hoffman, and that she believed Camargo's complaints against her were motivated by a desire to take O'Brien's job. (A.R. at 553.)
            Former Chair Hoffman testified that, prior to his resignation, the Treasurer had informed him that Commissioner Camargo sought to be appointed as the next Chair of the CCC. Hoffman told the Treasurer that "that was not a very good idea," because Commissioner Camargo did not satisfy the statutory qualifications and did not work collaboratively with the other commissioners. (A.R. at 765-66.) Hoffman further testified that Camargo "was focused more on her own agenda and her own brand than the overall work of the [CCC]," and did not have the "other commissioners' backs." (Id.)
            As to Collins, Hoffman praised his policymaking skills and ability to meet legislative mandates; but, at the same time, Hoffman testified that Collins was a "less effective" manager than Hoffman had hoped he would be. (A.R. at 761.) Hoffman also testified that, "[b]ecause of the Open Meeting Law," he"couldn't [] talk to the other commissioners except in public, to try
 
                                                            -15-
 
to give [Collins] specific guidance." (A.R. at 762.) Collins frequently stated that he reported to all the commissioners, rather than solely to the Chair, and, per Hoffman, "played [the commissioners] off against one another, and [] inculcated [the same approach] in the staff." (Id.) Hoffman's testimony echoed Attorney Spruce's report, to the effect that the current commissioners believed Collins lacked strong management skills and did not hold staff sufficiently accountable for their job performance. (A.R. at 1202-21, 1225.)
            O'Brien testified that, shortly after she was appointed Chair, Collins informed her that he might not remain at the CCC much longer. In February, 2023, Collins informed the commissioners that he was interviewing for external positions. O'Brien stated that it was clear early on that Collins was not fulfilling his duties, that it was widely known he "already had one foot out the door," and that his performance as Executive Director only worsened over time. (A.R. at 558-60, 692.) O'Brien explained at the hearing that her statement to Collins that termination was a "blunt instrument" was not intended to be a threat, but was instead conveyed as a warning that the commissioners only had binary options and that his job performance needed to improve. (A.R. at 559-61.) As for her statement during the July 28 public meeting regarding Collins' impending leave, O'Brien reasserted that she believed she had a duty to notify her fellow commissioners of this fact. This so that they could determine how the CCC would function during Collins' absence and, if necessary, appoint an acting executive director. (A.R. at 566-68.)
            D. The Treasurer's Decision
            On September 9, 2024, the Treasurer issued an 80-page final decision (the "Decision"), removing O'Brien as Chair of the CCC on the grounds that she was "unable to discharge the powers and duties of a commissioner" and had engaged in "gross misconduct" under G.L. c. 10,
 
                                                            -16-
 
§ 76(d)(3) and (4). In so doing, the Treasurer repeatedly excoriated O'Brien's conduct as "outrageous," "callous," "flagrant" and "cavalier." (A.R. at 5-8, 60-61.)
            The Treasurer found that O'Brien had knowingly and admittedly used the derogatory slur "yellow" in reference to persons of Asian descent. (A.R. at 23.) The Treasurer found that the racial epithet was unacceptable in any context and, therefore, rejected O'Brien's explanation that she had merely repeated the statement of an African-American real estate developer, had not directed the comment at any specific individual, and harbored no racial animus.
            The Treasurer further found that O'Brien's references to Commissioner Camargo and Sinclair as "buddies" was "disrespectful, rude and condescending," and that O'Brien's comments to the blogger/online journalist were "inappropriate,""unprofessional" and disparaged Camargo's qualifications. (A.R. at 28.) The Treasurer similarly concluded that O'Brien knew or should have known that her comment that certain staff were "articulate," whatever their educational background might be, was offensive. (A.R. at 32.) However, the Treasurer did not find that any of these comments to or about Commissioner Camargo and CCC staff were racially motivated.
            The Treasurer did conclude, however, that O'Brien's statement to Commissioner Camargo regarding State Senator Edwards and her statement to Attorney Jones regarding a staff member's accent reflected race-based assumptions. Specifically, the Treasurer inferred that, although O'Brien "offer[ed] possible explanations for why Commissioner Camargo and Senator Edwards might know each other (or, at least, know of each other)," she "made the comment at least in part" because of the fact that "they are the same race." (A.R. at 26.)
            Regarding the managerial treatment of Collins, the Treasurer found that O'Brien "bullied" and "threatened" Collins by yelling at him, including by referring to a "blunt
 
                                                            -17-
 
instrument" in the context of his possible termination. (AR. at 35-37). The Treasurer reasoned, "[t]here is nothing inappropriate in a supervisor advising an employee about the possibility that continued poor performance could result in the employee's termination. It becomes troublesome and inappropriate, however, when the supervisor uses a term like ' blunt instrument' - a menacing phrase that evokes imagery of a weapon - to describe the tools to bring about the termination." (A.R. at 37.)
            The Treasurer also found that O'Brien's reference to Collins' parental leave as a "personal issue" was unwelcome, and would likely cause Collins embarrassment (particularly in a public setting); and she specifically rejected any suggestion that O'Brien had not intended a negative connotation in this reference as "disingenuous." (A.R. at 39-40.) The Treasurer likewise found that (1) O'Brien knew or should have known that her comment on July 18, 2023 regarding her comparatively shorter parental leave would likely make Collins fear for his ability to exercise full leave rights without reprisal; (2) O' Brien was "deliberately and unnecessarily hostile" in pressuring Collins during the July 27, 2023 public meeting to announce his leave plans; and (3) O' Brien revealed Collins' leave-taking intentions during the July 28, 2023 public meeting, despite knowing that it was both harmful to Collins and legally risky. (A.R. at 40-41, 47-50.) The Treasurer, citing O' Brien's prior testimony that Collins had been"missing in action" while serving as Executive Director, did not credit O'Brien's explanation that she felt compelled to raise the issue because of the Open Meeting Law and out of concern for the CCC's organizational stability. (A.R. at 46-47.) The Treasurer believed that O' Brien could and should have raised this matter in an executive session. (A.R. at 47-48.)
            Finally, the Treasurer found that O'Brien's yelling at her executive assistant on July 27 had been " unprofessional," but that it fell short of bullying. (A.R. at 52.)
 
                                                            -18-
 
            In concluding that O'Brien had engaged in "gross misconduct" under G.L. c. 10, § 76(d)(4). the Treasurer reasoned that use of the term "yellow" was "utterly unacceptable" "in any context," and particularly "outrageous when coming from the leader of an organization charged with advancing the economic interests and opportunities of people of color . . . ."(A.R. at 60.) The Treasurer further stated that, for a person in O'Brien's position to assume that "all women of color in politics, or all successful women of color, in Boston must know one another is ludicrous... obtuse, outrageous, and intolerable," and reflects a "callousness and/or recklessness and lack of sensitivity as to racial and ethnic issues." (A.R. at 61.) The Treasurer likewise noted that O'Brien's statements about the eloquence and lack of accent of certain CCC staff members were "similarly troubling." (Id.)[15] The Treasurer added that O'Brien's references to Sinclair as Camargo's "buddy" was harassing "in the lay sense of the term," and violated the CCC Employee Handbook's stated commitment "to providing a safe and collegial work environment based on mutual respect" and "free from discrimination and harassment." (A.R. at 65, quoting A.R. at 1728, Handbook, § 3.)
            The Treasurer further concluded that O'Brien had bullied Collins, and "flagrant[ly]" interfered with Collins' parental leave rights. (A.R. at 7, 63.) The Treasurer characterized these actions as "abhorrent," "shameful"  and  "especially  outrageous,"  given  that  they  exposed  the CCC to potential legal liability. (A.R. at 63-64.) The Decision explained that "family  leave rights are historically :fundamental to the workforce participation of caregivers, including women, one of the constituencies the legislature singled out for protection in the legalization statute." (A.R. at 63.) The Treasurer relatedly concluded that O'Brien's stated grounds for raising this issue were
 
--------------------------------------------
 
[15] The Decision also criticized O'Brien for an off-hand comment made during her hearing testimony. In his questioning, O'Brien's counsel mistakenly referred to Shawn Collins as "Shawn O'Brien," prompting O'Brien to respond "You're getting all  us Irish people mixed up."(A.R. at  143.) The Decision asserted that, "[w]hile intended to be humorous," O'Brien's remark demonstrated a "shocking insensitivity to the issues at hand."(A.R. at 61.)
 
                                                            -19-
 
pretextual, that she was not genuinely concerned about the effect of Collins' absence on the work of the CCC, and that her behavior during the public meeting had been "petty, vindictive, and inexcusable." (A.R. at 69.)
            Lastly, the Treasurer concluded that O'Brien's was "unable to discharge" her duties as Chair. The Treasurer rested this conclusion on O'Brien's demonstrated failure to comply with the CCC's Handbook and Code of Ethics, viz., her racially insensitive conduct, which might cast reasonable doubt as to whether the CCC is making unbiased decisions and fulfilling its social equity mandate. (A.R. at 71-72.)
            As part of her Decision, the Treasurer issued "Supplemental Findings and Conclusions" regarding the reports of the anonymous witnesses, this notwithstanding her purported "deference" to the Officiant's conclusion that such statements were unreliable. (A.R. at 75.) The Treasurer proclaimed that, "insofar as it is ever found that the statements ... are appropriate for [her] consideration," they further supported O'Brien's removal (Id.) The Treasurer maintained that the anonymous witnesses credibly feared retaliation from O'Brien. However, the Supplemental Findings did not cite any specific actions by O'Brien (or any other basis) for this belief, except for O'Brien's and Commissioner Roy's own testimony that the CCC has a "toxic internal work culture" and that licensees "are fearful of retribution from CCC staff." (A.R. at 77 [emphasis added], citing A.R. at 541, 543, 700.) The Treasurer further found that O'Brien likely made the comment that an employee of color should be able to speak about Upham's Comer, and that such statement reflected another offensive, race-based assumption. Finally, the Treasurer credited reports that anonymous witnesses perceived other interactions involving the Chair - e.g., O'Brien's email that she could meet two newly hired employees of color in Boston
 
                                                            -20-
 
- to be racially, ethnically and culturally insensitive.[16]
            Following issuance of the Decision, O'Brien initiated the present action in the Supreme Judicial Court ("SJC") to challenge her dismissal. On November 14, 2024, a Single Justice of the SJC (Wolohojian, J.) transferred the case to this Court.
DISCUSSION
            O'Brien argues that the Court must vacate the Treasurer's Decision and reinstate her as Chair, because the record does not demonstrate either that she committed "gross misconduct," G.L. c. 10, § 76(d)(4), or that she was "unable to discharge" her duties as a CCC commissioner, G.L. c. 10, § 76(d)(3). The Court agrees. For this reason, the Court need not address O'Brien's additional and alternate arguments that she was denied constitutional due process in the administrative hearing below.[17] See Levy v. Acting Governor, 436 Mass. 736, 752 (2002) (Levy II") ("Because we conclude that the decision to remove [the plaintiffs] is not supported ... , we need not address the claims that they were denied procedural due process at their hearing . . .").
I. STANDARD OF REVIEW
            A civil action in the nature of certiorari under G.L. c. 249, § 4 is "a limited procedure" to correct "errors of law committed in proceedings affecting [a party's] justiciable rights when no other means of relief arc open." Figgs v. Boston Hous. Auth.• 469 Mass. 354, 361 (2014) (quotation omitted). "[O]rdinarily, where the action being reviewed is a decision made in an adjudicatory proceeding where evidence is presented and due process protections are afforded, a
 
--------------------------------------------
 
[16] As to this email, O'Brien testified that the CCC maintains bases in both Worcester and Boston, and that she suggested the Boston location as a meeting site because she lives closer to Boston, one of the referenced employees ran for Boston City Council in 2019, and the other was employed by the Boston Health Commission until 2022. None of this testimony is refuted anywhere in either the record or the Treasurer's Decision.
[17] O'Brien variously contends that she was denied due process because the Treasurer was not a neutral arbiter, did not provide adequate notice of the grounds for her removal and burden of proof regarding same, and denied O'Brien compulsory process in connection with the administrative hearing.
 
                                                            -21-
 
court applies the 'substantial evidence' standard." Id. at 361-62. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Durbin v. Selectmen of Kingston, 62 Mass. App. Ct. 1, 6 (2004). The "review does not turn on whether, faced with the same set of facts, [the Court] would have drawn the same conclusion ... , but only whether a contrary conclusion is not merely a possible but a necessary inference." Goldberg v. Board of Health of Granby, 444 Mass. 627, 638 (2005), quoting Commissioner of Revenue v. Houghton Mifflin Co., 423 Mass. 42, 43 (1996). The Court "examine[s] the entirety of the administrative record and take[s] into account whatever in the record fairly detracts from the
supporting evidence's weight." Cobble v. Commissioner of Soc. Servs., 430 Mass. 385,390 (1999), citing New Boston Garden Corp. v. Assessors of Boston, 383 Mass. 456,466 (1981). "[T]he substantial evidence test accords an appropriate degree of judicial deference to administrative decisions, ensuring that an [administrator's] judgment on questions of fact will enjoy the benefit of the doubt in close cases, but requiring reversal by a reviewing court if the cumulative weight of the evidence tends substantially toward opposite inferences." McGovern v. State Ethics Comm'n, 96 Mass. App. Ct. 221,231 (2019), quoting Cobble, 430 Mass. at 391.
            Here, the Treasurer concedes that her decision to remove O'Brien is subject to certiorari review and to the substantial evidence test thereunder. (Def.'s Opp. at 6.). See Levy II, 436 Mass. at 748 (substantial evidence test applied to Governor's removal of administrators of independent agency). Thus, the question before the Court is whether the Treasurer' s Decision reveals "substantial errors of law apparent on the record,'' Doucette v. Massachusetts Parole Bd., 86 Mass. App. Ct. 531, 540-41 (2014), quoting from Firearms Recs. Bureau v. Simkin. 466 Mass. 168, 180 (2013), and, at the same time, whether there was substantial evidence to support the removal of O'Brien as Chair. Figgs, 469 Mass. at 362.
 
                                                            -22-
 
            The CCC's governing statutes do not define either "gross misconduct" or "unable to discharge the powers and duties of the commissioner's office." See G.L. c. 10, § 76, G.L. c. 94G, §§ 1-14. Nor are these terms defined in any of the several Massachusetts statutes employing identical or analogous removal provisions.[18] The parties further acknowledge that no Massachusetts court has yet had occasion to interpret these terms in the context of any of the statutes cited.
            In construing a statute, the Court seeks "to ascertain and effectuate the intent of the Legislature in a way that is consonant with sound reason and common sense." Commonwealth v. Wassilie, 482 Mass. 562, 573 (2019). The statutory text is "the principal source of insight" into the Legislature's intent. Commonwealth v. Rossetti, 489 Mass. 589, 593 (2022) (quotations omitted). See Commonwealth v. Williamson, 462 Mass. 676, 679 (2012) ("[W]e start with the language of the statute itself and presume ... that the Legislature intended what the words of the statute say." [quotation omitted]). Where necessary, the Court may "derive the words' usual and accepted meaning from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." Rossetti, 489 Mass. at 593 (emphasis added), quoting Commonwealth v. Vigiani, 488 Mass. 34, 36 (2021).
            "[T]he words of a statute must [also] be read in their context and with a view to their place in the overall statutory scheme." Dermody v. Executive Off. of Health & Hum. Servs., 491 Mass. 223, 230 (2023) (quotations and citation omitted). All provisions of the statute should thus be read in harmony "to give full effect to the expressed intent of the Legislature," Marengi v. 6.
 
--------------------------------------------
 
[18] Sec G.L. c. 23K, § 3 (applying identical removal provisions to members of Gaming Commission); G.L. c. 6E, § 2 (to State Peace Officer Standards and Training Commission); G.L. c. 268B, § 2 (to State Ethics Commission); and G.L. c. 19C, § 2 (to Disabled Persons Protection Commission). See also G.L. c. 12A, § 2 (Inspector General removable "for cause," which "may include substantial neglect of duty, gross misconduct or conviction of a crime."); G.L. c. I158, § 3 (to Veteran Advocate); G.L. c. 18C, § 3 (to Child Advocate).
 
                                                            -23-
 
Forest Rd. LLC, 491 Mass. 19, 25 (2022), and to avoid rendering any part meaningless. City Elec. Supply Co. v. Arch Ins. Co., 481 Mass. 784, 790 (2019). Accord Ropes & Gray LLP v. Jalbert, 454 Mass. 407,412 (2009) ("A statute should be construed so as to give effect to each word, and no word shall be regarded as surplusage.").
            Finally, canons of interpretation "are advisory, not mandatory;" and the Court does "not apply them mechanically or dogmatically," but will instead "inspect the results ... for rationality and practicality." Commonwealth v. Graziano, 96 Mass. App. Ct. 601, 604 (2019), quoting Commonwealth v. Hourican, 85 Mass. App. Ct. 408,411 (2014). The Court will not construe a statute so strictly or so literally as to produce a result that is either illogical or plainly inconsistent with the Legislature's intent. Randolph v. Commonwealth, 488 Mass. 1, 5 (2021); Ciani v. MacGrath, 481 Mass. 174, 178 (2019).
            The Court now addresses the two relevant provisions of G.L. c. 10, § 76(d) in turn.
II. GROSS MISCONDUCT
            The Treasurer's Decision- and the parties' briefs -cite to Black's Law Dictionary and to Massachusetts precedent defining "gross misconduct" by private employees and licensed
professionals. Finding no case law directly on point, sec ante, the Court will consider the cited authorities. See Rossetti, supra at 593.
            "[G]ross misconduct in the workplace" is defined as "[i]ntentional or reckless behavior that might harm someone, esp[ecially] a fellow employee, or the employer. [It] may include acts in disregard of the safety of others, unlawful discrimination, libel, harassment, and various criminal offenses." MISCONDUCT, Black's Law Dictionary (12th ed. 2024). At the same time, gross misconduct does not exist where the subject behavior is inadvertent or sporadic, or the result of mere carelessness or inattention to detail. See Moore v. Williams Coll., 702 F. Supp. 2d
 
                                                            -24-
 
19, 24-25 (D. Mass. 2010), aff’d. 414 F. App'x 307 (1st Cir. 2011).[19]Accord Johnson v. Berkshire Mut. Fire Ins. Co., 86 Mass. 388, 390 (1862) ("mere negligence," even conduct that was "very imprudent," does not constitute gross misconduct). As the SJC explained in Hellman v. Board of Registration in Med.:
"'Misconduct'... implies that the conduct complained of was willed and intentional. It is more than that conduct which comes about by reason of error of judgment or lack of diligence. It involves intentional wrongdoing or lack of concern for one's conduct. Whether or not an act constitutes misconduct must be determined from the facts surrounding the act, the nature of the act, and the intention of the actor. 'Gross' is generally defined as 'flagrant' and 'extreme.' ... Webster's New [Int'l] Dictionary 1106 (2d ed. 1959) defines 'gross' in part to mean '[o]ut of all measure; beyond allowance; not to be excused; flagrant; shameful; as, a gross injustice.' In the context of negligence, we have stated: 'Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care . . . .It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others."'
404 Mass. 800,804 (1989)(emphasis in original, citations omitted). "In short, the conduct at issue must generally be outrageous, extreme or unconscionable to constitute gross misconduct." Moore, 702 F. Supp. 2d at 24 (internal quotation omitted). This requires a heightened level of culpability- viz., an "evil design" or, absent malice, "an intentional and substantial disregard of the employer's [or co-worker's] interests." Id. (quotations omitted), citing Nakisa v. Continental Airlines, No. CIV. A. H-00-090, 2001 WL 1250267, at *3 (S.D. Tex. May 10, 2001) (gross misconduct found where employee called black co-worker the n-word, threw an apple at her, and instigated a physical altercation); Bryant v. Food Lion Inc., l 00 F. Supp. 2d 346, 365
 
--------------------------------------------
 
[19] In Moore, the relevant statute (29 U.S.C. § 1163(2)) precluded an individual who was fired for "gross misconduct" from obtaining COBRA benefits and, as here, the term was not defined in either the statute or accompanying regulations. Moore, 702 F. Supp. 2d at 24.
 
 
                                                            -25-
 
(D.S.C. 2000), aff’d, 8 F. App'x 194 (4th Cir. 2001) (gross misconduct found where employee repeatedly and persistently refused to follow supervisor's instructions); Zickafoose v. UB Servs. Inc., 23 F. Supp. 2d 652, 654 , 657 (S.D. W. Va. 1998) (employee battered and hospitalized co-worker); Burke v. American Stores Emo. Benefit Plan. 818 F. Supp. 1131, 1133, 1138 (N.D. Ill. 1993) (employee stole from employer). Decisions of the SJC concerning professional wrongdoing likewise reflect that gross misconduct typically requires either flagrant or willful acts of deceit or an abuse of trust that exhibits an utter indifference to an established duty. Hellman. 404 Mass. at 806.[20]
            The Court must also read G.L. c. 10, § 76(d)(4) in the context of the mandate of the CCC to function as an independent body. Levy II, 436 Mass. at 749. In Levy II, the SJC reviewed the Governor' s removal of two members of the Turnpike Authority "for cause" under G.L. c. 30, § 9. Id. at 746. Because "cause" was not defined in G.L. c. 30, § 9, the SJC held that it "should be determined in light of [the Authority's] statutory powers and duties." Id. at 749. Accord Flomenbaum v. Commonwealth, 451 Mass. 740, 746 (2008) ("[W]hat constitutes sufficient cause to remove the head (or a member) of a governmental agency from office is determined in the context of the authority of the particular agency to act as an independent body.'l Importantly, the SJC held that, because the Legislature had established the Authority as an
 
--------------------------------------------
 
20. See, e.g. Kellogg v. Board of Registration in Med., No. SJ-2010-0382, 201l WL 13224166, at • 2 (Mass. Feb. 4, 2011), affd,461Mass. 100 1 (2011) (practicing medicine without insurance despite representing otherwise and refusing to provide board with records to permit proper oversight supported gross misconduct); Ramirez v. Board of Registration in Med., 441 Mass. 479, 485 (2004) (physician's "sexual conduct with patients during office visits constitutes gross misconduct" ); Hannan v. Enterprise Pub. Co., 341 Mass. 363, 365 (1960) (employee refused to perform task that was within scope of duties); Forziati v. Board of Registration in Med.•333 Mass. 125, 128 (1955) (physician conspired to direct patients to attorney in exchange for share of fees from personal injury claims); In re Keenan, 313 Mass. 186, 190-91 (1943) (attorney sought to corruptly influence juror); Kennedy v. Holyoke, 312 Mass. 248, 249-50 (1942) (clerk of public works misappropriated city funds); Bar Ass'n of Boston v. Sleeper, 251 Mass. 6, 14 (1925)(attorney lied to implicate two other members of the bar in blackmail scheme); In re Allin, 224 Mass. 9, 12 (1916) (attorney settled client's case to facilitate attorney's unrelated real estate transaction with defendants). Cf. Hellman, 404 Mass. at 805-06 (physician's unauthorized disclosure of patient' s treatment to defense attorney in patient's medical malpractice action held not gross misconduct).
 
                                                            -26-
 
independent corporate body with limited executive oversight, the Governor did not have the power to remove its members merely for reasons "advanced in 'good faith and honest judgment,'... or [for] an honest dispute over policy." Levy II, 436 Mass. at 749. Rather, as applied to the Turnpike Authority, "cause" required substantial evidence of malfeasance, misfeasance, or willful neglect of duty. Id. at 748-49. Moreover, the SJC declared that the Governor's removal of members of the Turnpike Authority, an independent agency, was "not a decision to which deference is accorded. Rather, it is a decision that must be given very close scrutiny." Id. at 748.
            The same principles apply in the case at bar. The CCC is a bipartisan commission comprised of five members, appointed under the shared authority of the Governor, the Attorney General and the Treasurer, and subject to removal only on five enumerated grounds. See G.L. c. 10, § 76( a), (d). Absent such grounds, the Appointing Authorities have only limited supervisory and managerial powers over the CCC. Cf. Levy II, 436 Mass. at 746. The statute does not invest them with any "authority to act in place of the [CCC's] members" or to substitute their own judgment for that of the commissioners. Id. at 747. The commissioners arc " not appointed to carry out the policies" of their Appointing Authorities, but rather to fulfill the policies of the CCC as determined by its members. Id. This statutory scheme reflects the Legislature's unmistakable intent that the CCC act as an independent deliberative body, "free from the changing winds of politics." Id. at 748.[21] As such, the " gross misconduct" mandated by§ 76(d)(4) cannot be interpreted or applied, as the Treasurer has done here, in an expansive manner that undermines the very independence the Legislature sought to vest in the CCC. Id. at 746
 
--------------------------------------------
 
[21] The statutory provisions prohibiting commissioners from seeking or serving in other governmental offices or as party officials, and imposing strict conflict of interest and disclosure requirements, reinforce the Court's reading that independence is central to the design of the CCC. See Bribriesco-Ledger v. Klipsch, 957 N.W.2d 646, 661-63 (Iowa 2021) (Appel, J., dissenting) ("[T]he creation of an independent agency is often motivated by a concern with agency capture ... further exacerbated by the fact that industry groups are ... well positioned to contribute to political campaigns and to lobby."), quoting Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15, 17 & 22 (2010).
 
                                                            -27-
 
(where traditional models of executive oversight are absent, agency members have ''a greater interest in retention").
            Finally, the term "gross misconduct" must also be construed in rational counterpoint to the prior "for cause" standard under G.L. c. 30, § 9, a much lower threshold for removal that the Legislature expressly rejected. See Commonwealth v. Resende, 474 Mass. 455,466 (2016) (courts may "presume that the Legislature is aware of the prior state of the law as explicated by the decisions of [the SJC]" [quotation omitted]).[22]
            In the present case. the central facts arc essentially undisputed. O'Brien does not contest that she made the particular statements attributed to her, and several are matters of public record. Nevertheless, and as explained below, her concededly ill-considered remarks and other putative failures of leadership reflect, at most, errors of judgment falling far below the statute's "gross misconduct" threshold for removal. They do not approach - singularly or collectively - the kind of flagrant, outrageous or unconscionable acts that our case law has recognized as essential to a finding of gross misconduct. The substantial evidence test affords an agency adjudicator "the benefit of the doubt in close cases," Wilson v. Department of Soc. Servs., 65 Mass. App. Ct. 739, 747 (2006), quoting Cobble, 430 Mass. at 391. But this is plainly not such a case.
            First, the Treasurer committed clear error when she found that O' Brien' s singular reference to "black, brown, and yellow" persons, regardless of context, constituted gross
 
--------------------------------------------
 
[22] The Treasurer's arguments notwithstanding, the facts which distinguish this case from Levy II do not accrue in her favor. As initially enacted,§ 76(d) permitted the Treasurer to remove any commissioner for "neglect of duty, misconduct or malfeasance in office," St. 2016, c. 334, § 76(d)- grounds essentially equivalent to the SJC's definition of the "for cause" standard for independent commissioners in Levy II, 436 Mass. at 749 (requiring "malfeasance, misfeasance, or wilful neglect of duty"). As amended, by contrast, § 76(d) requires" malfeasance; substantial[] neglect of duties; [and] gross misconduct, [etc.]," amendments that must be viewed as a narrowing of the grounds for a commissioner's removal, particularly as to§ 76(d)(4) [gross misconduct] (emphasis added). To be sure, Levy )I concerned removal based on a specific policy decision. But as CCC Chair, O'Brien's interactions with other commissioners and staff are clearly part and parcel of the development and implementation of the commission's policies. The only plausible conclusion here, therefore, is that§ 76(d)(4) now imposes a substantially higher threshold for removal than what the SJC construed and applied in Levy II.
 
                                                            -28-
 
misconduct. The Treasurer not only disregarded unrefuted and critically contextualizing evidence - viz., that O'Brien (1) was quoting another individual (and person of color); (2) did not direct the statement offensively toward any specific person; and (3) was advocating for acts in furtherance of the CCC's social equity mission; she actually faulted O'Brien for attempting to "conceptualiz[e]"the remark. (A.R. at 60.) That is simply not the law as it pertains to gross misconduct, including the very civil rights precedents cited in the Treasurer's Decision.[23]
            It cannot be gainsaid that "yellow" (as applied to persons of Asian national origin) constitutes a derogatory slur and is, in a broadly normative sense, unacceptable in public parlance. While "black," "brown" and "white" are generally accepted terms in the vocabulary that prevails concerning race or ethnicity,[24] for historical reasons, ''yellow" is not.[25] This fact,
 
--------------------------------------------
 
[23] The legal texts cited in the Treasurer's Decision specifically analogize "gross misconduct" in the workplace to actionable discrimination or harassment. See Moore; Nakisa; Black's Law Dictionary, supra. The Court recognizes that§ 76(d)(4) serves a distinctly different purpose relative to that of G.L. c. 15lB, Title VII and related anti- discrimination laws. The purpose of c. 1518, and its federal counterparts, is to eliminate barriers to full participation in the workforce based on protected class status. See Cuddyer v. Stop& Shop Supermarket Co., 434 Mass. 521, 534 (2001); McKennon v. Nashville Banner Pub. Co., 513 U.S. 352,358 (1995). The harm to be remedied is the  impact of such prohibited discrimination. McKennon, 513 U.S. at 358. By contrast, the standard of"gross misconduct" focuses on the culpability of the actor, and distinguishes acute misconduct worthy of severe punishment from the more routine, albeit undesirable, transgressions that permeate the modern workplace. See Hellman; Moore, supra. These distinctions notwithstanding, the analogy points up the importance of one particular principle that is shared between employment discrimination and gross misconduct jurisprudence - namely, that offenses and acts of mistreatment in the workplace may be recognized as such, and yet still fall well short of the threshold of severity to be civilly actionable. See Muzzy v. Cahillane Motors, Inc., 434  Mass. 409,411 (2001) (conduct must be "sufficiently severe and pervasive" to constitute a hostile work environment). So too acts reflecting insensitivity or race-based assumptions on the part one who holds a position of agency leadership. Such acts may be objectionable, and even seriously so, yet still fall far short of constituting grounds for statutory terminability. Anti-discrimination laws do not seek to remedy all sharp or offensive remarks, much less spare employees "the usual ebb and flow of power relations and inter-office politics." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54(1st Cir. 2000). Likewise, the language and design of§ 76(d) cannot fairly be construed to subject commissioners to removal for comments which, although thoughtless, are not severe in their impact. Where, as here, the issue sub judice concerns O'Brien's comments themselves rather than any adverse official acts - e.g., discharge  or  failure to promote an employee, denial of a license or other entitlement to an applicant, and the like - the standard for a hostile work environment provides a fitting measuring stick by which to evaluate her conduct. Sec National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 {2002) (hostile work environment claims concern the cumulative effect of incidents, each of which, standing alone, may not constitute an adverse employment action).
[24] The Court acknowledges that even these terms are part of an ever-evolving discourse and lexicon as relates to persons "of color," and may not be universally favored.
[25] See generally. Michael Keevak, Becoming Yellow: A Short History of Racial Thinking (Princeton Univ. Press 2011). See also Office of Management and Budget, Revised Definitions for Minimum Race/Ethnicity Reporting
 
                                                            -29-
 
however, cannot end the inquiry. Context matters. As recognized in the Treasurer' s Decision, gross misconduct is defined by "intentional or reckless ... disregard for the safety of others," including, for example, " unlawful discrimination and harassment." MISCONDUCT, Black' s Law Dictionary (12th ed. 2024). Accord Moore, Nakisa, supra. It is black-letter law, however, that harassment and discrimination are evaluated based on "the totality of the circumstances, which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."' 15 LaGrange St. Corp. v. Massachusetts Comm'n Against Discrimination, 99 Mass. App. Ct. 563,572 (2021), quoting Harris v. Forklift Sys. Inc. 510 U.S. 17, 23 (1993).[26] As such, not every "utterance of an ethnic or racial epithet which engenders offensive feelings" will constitute actionable misconduct. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quotation omitted).[27] As noted, there was no finding or evidence that O'Brien uttered the term with any racial animus or hostility, either toward a specific individual or toward Asian-Americans collectively. See Moore, 702 F. Supp. 2d at 24 (noting that conduct must generally evince an "evil design," "malice," or "intentional and substantial disregard of the employer's interests"). To the contrary, O'Brien used this ill- chosen term in the course of advocating for persons of color. Her subsequent confession of
 
--------------------------------------------
 
Categories in 2024 SPD 15, Categories and Definitions, available at https://spd15revision.gov/content/spd l5revision/en/2024-spd15/categories-definitions.html.
[26] In evaluating discriminatory harassment under Massachusetts law, our courts often look to precedent under Title VII of the Civil Rights Act of 1964, the analogous federal statute. See College-Town, Div. of Interco. Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 163 (1987).
[27] Cases where the discrete utterance of a racial epithet has risen to an actionable level are generally limited to use of the n-word, or variations thereof, directed at a specific individual(s). Brookline v. Alston. 487 Mass. 278, 300 n.23 (2021) (referring to the epithet as ''the most noxious racial epithet in the contemporary American lexicon"), quoting Monteiro v. Tempe Union High Sch. Dist., 158 F.3d l022, 1034 (9th Cir. 1998). Accord Nuness v. Simon& Schuster. Inc.• 325 F. Supp. 3d 535,547 (D.N.J. 2018) (citing cases); Rogers v. City of New Britain. 189 F. Supp. 3d 345,356 (D. Conn. 2016); Nakisa, 2001 WL 1250267, at *3. O' Brien's remark in this case was plainly different in both kind and degree.
 
                                                            -30-
 
wrongdoing during the Jones investigation is not, as the Treasurer insists, evidence of a malevolent or reckless state of mind at the time of the comment' s making. Viewed in fair context, the record reveals nothing more than a careless and clumsy choice of words. A misjudgment, to be sure, and nothing to trivialize, but not "gross misconduct" under any rational construction of the standard expounded hereinabove.
            O'Brien's remarks to and about Commissioner Camargo likewise fail to constitute evidence of gross misconduct. In her Decision, the Treasurer found that O'Brien's comments concerning Commissioner Camargo's qualifications for the CCC chairmanship, and her references to Sinclair as her "buddy," were rude and unprofessional. Perhaps. But the laws governing the workplace do not prescribe codes of general civility. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (I 998). They do not prohibit "the ordinary tribulations of the workplace," whether it be "the sporadic use of abusive language, gender-related jokes, [or] occasional teasing." Id. See Clark Cnty. Sch. Dist. v. Breeden 532 U.S. 268,271 (2001) ("simple teasing, off-hand comments, and isolated incidents unless extremely serious" are not actionable); MAP Installed Bldg. Prods. of Seekonk, LLC v. Ivie, No. 1884CV1807BLSI, 2020 WL 2737234, at *8 (Mass. Super. Apr. 17, 2020) (Green, J.) ("[A]mbiguous and isolated remarks are insufficient to warrant a finding of [ ] harassment, discrimination, or an otherwise abusive or hostile workplace environment."), citing Finney v. Madico, Inc., 42 Mass. App. Ct. 46, 50-51 (1997); Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. 443,450 (1996) (similar). There is simply no basis upon which to infer that the Legislature, in enacting § 76(d)(4), intended to depart from these fundamental principles, and instead establish a threshold for commissioner removal substantially lower than any prevailing definition of misconduct, harassment or discrimination.
 
                                                            -31-
 
            As for O'Brien's disparaging comment to the journalist, it bears note that the CCC's prior Chair shared this very assessment of Camargo's qualifications (or lack thereof). That O'Brien expressed the perspective publicly in response to a journalist's question- and obliquely, without even mentioning Camargo by name- cannot plausibly qualify as grounds for removal. Regarding the "buddy" remarks, there was no evidence or finding by the Treasurer that these comments were racially motivated or implied any improper relationship between Camargo and Sinclair. They indicate, at most, the kind of anodyne teasing that has never been considered actionable, much less evidence of extreme or outrageous misconduct. Indeed, the Treasurer herself forthrightly acknowledged in the Decision that these comments failed to meet any legal definition of harassment. (See A.R. at 64.)
            Section 76(d)(4) cannot properly be construed to subject CCC commissioners to removal for "ordinary, if occasionally unpleasant, vicissitudes of the workplace." Noviello v. Boston, 398 F.3d 76, 92 (2005). The CCC is a five-member, bipartisan commission tasked with administering a multi-billion dollar industzy. A certain level of friction and discord among its constituent members -  and between commissioners and staff -  is not merely inherent, but an intended feature of such a statutory scheme. See ante.[28] While intra-commission conflicts will ideally not devolve into petty sniping, political discourse is not beanbag. The core function of a deliberative body would be chilled (and potentially thwarted altogether) if evezy breach of decorum, unkind word, or unwelcome remark could be marshaled to construct a case for removal. The Legislature could not have intended such a result for CCC commissioners whom it so assiduously sought to
 
--------------------------------------------
 
[28] "[M]ulti-member bodies are often not as efficient as single-headed agencies and can be beset by contentious relations among the members[;)" but they also ''can foster more deliberative decision making[,) ... [and] benefit from diverse perspectives and different points of view among the commissioners . . . The multiple voices and perspectives make it more likely that the costs and downsides of proposed decisions will be more fully ventilated." PHH Corp. v. Consumer Fin. Prot. Bureau. 881 F.3d 75, 184, 186 n.14 (D.C. Cir. 2018) (Kavanaugh, J., dissenting), majority opinion abrogated ];u'.Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197 (2020).
 
                                                            -32-
 
invest with protected independence.
            O'Brien's additional comments regarding a staff member's lack of an accent and Commissioner Camargo's possible familiarity with Senator Edwards likewise supply no grounds supporting O'Brien's removal from office. Once again, the requisite culpability of intent and severity of impact required for gross misconduct are manifestly lacking. There is no evidence that these statements were either pervasive or directed with animus or malevolent motive. "[D]iscourtesy or rudeness should not be confused with racial harassment," and "a lack of racial sensitivity does not, alone, amount to actionable harassment." Faragher, at 787 (quotation omitted).[29] Arguably insensitive, ill-considered comments of the sort attributed to O'Brien, though not to be condoned in any context, simply do not amount to gross misconduct.[30]
            O'Brien's treatment of Collins, the CCC's Executive Director, likewise fails to clear the threshold of "gross misconduct." As to her "blunt instrument" reference, the Treasurer acknowledged that O'Brien was well within her authority to inform Collins that continued
 
--------------------------------------------
 
[29] See, e.g.. Daywalker v. University of Texas Med. Branch at Galveston, 641 F. Supp. 3d 362, 369, 376 (S.D. Tex. 2022), aff'd sub nom., No. 22-40813, 2024 WL 94297 (5th Cir. Jan. 19, 2024) (no hostile work environment where medical residency director (I) asked black medical student "why most Black people in Philadelphia used the emergency room for the majority of their health care," even though student had never worked in Philadelphia; and (2) told a student that black medical students were not interested in otolaryngology).
[30] In this regard, the Treasurer's reliance on the provisions of the CCC Employee Handbook is unavailing. Sections 3 and 3.11 of the Handbook, inter alia, prohibit "bullying of employees or using of threatening language," and state that the CCC is "committed to providing a safe and collegial work environment based on mutual respect ... free from discrimination and harassment." (A.R. at 1728, 1732.) However, as discussed ante, O'Brien's conduct does not meet any legal definition of harassment or discrimination. The terms "collegial" and "bullying" are not defined in the Handbook, and there is no record that O'Brien was ever warned or disciplined for such comments and nonetheless persisted in their making. The Treasurer herself appears to recognize that these provisions of the Employee Handbook provide thin cover for her dismissal of O'Brien, as the Decision endorsed them only half- heartedly. (Sec A.R. at 67) (wherein Treasurer concluded that O'Brien had engaged in bullying, "[p]utting aside whether Chair O'Brien's behavior [actually} violated the Handbook"). Regardless, to conclude that the minor barbs at issue constitute "gross misconduct" would require the Court to disregard the consistently embraced meaning accorded that term in the caselaw, and instead conclude that§ 76(d)(4) establishes a code of managerial civility. This is a conclusion that cannot be squared with the CCC statute's language or purpose.
 
                                                            -33-
 
unsatisfactory performance could result in his termination by the commissioners.[31] The record further demonstrates that the CCC's former Chair and several other commissioners shared the same concerns regarding Collins' managerial shortcomings. In the face of these facts, the Treasurer appears to take greatest issue with the particular language O'Brien used to convey her message to Collins. But the notion that such minutia could serve as even partial evidence of gross misconduct does not comport with any reasonable reading of§ 76(d)(4). Moreover, there is no suggestion that Collins himself interpreted the "blunt instrument" remark as a "menacing" threat of weapon-borne physical harm, as the Treasurer's Decision catastrophizes, or as anything other than a colorful reference to the risk of potentially peremptory dismissal he faced. No reasonable listener could interpret O'Brien's vocabulary  here as  anything other than metaphorical and innocuous.
            The Treasurer's conclusion that O'Brien "flagrantly interfered" with Collins' parental leave rights also constituted a clear error of law. There is no evidence that O'Brien denied Collins his due leave benefits, or retaliated against him for claiming such benefits in any manner that might be deemed interference (flagrant of otherwise). See Kleya v. Karl Storz Endovision, Inc., 385 F. Supp. 3d 99, 104 (D. Mass. 2019) ("[T]he key issue is simply whether the employer provided its employee the benefits to which she was entitled . . ."),quoting Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 722 n.8 (1st Cir. 2014).[32] When Collins questioned O'Brien's reference to his prior leave as a "personal issue" -i.e.,an absence of two
 
--------------------------------------------
 
[31] Collins "served at the pleasure" of the CCC. See G.L. c. 10, § 760). In general, an at-will employee like Collins can be discharged for any reason or no reason at all, Edwards v. Commonwealth. 488 Mass. 555, 565 (2021), and a party may of course threaten to do that which it has a legal right to do. Sec Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432,439 (1992).
[32] The Treasurer also maintains that O'Brien's actions violated §§ 6.7 and 6.9 of the CCC Employee Handbook; but these sections of the commission's personnel manual merely recite the employee's rights to benefits which, once again, Collins received in full.
 
                                                            -34-
 
weeks due to the birth of his child-O'Brien immediately clarified that she misspoke and did not intend to mischaracterize his leave as such. Likewise, O'Brien's remark to  Collins concerning the comparative length of her own parental leave, even assuming the comment carried an implied criticism or other negative connotation, did not constitute interference or retaliation, much less gross misconduct. See Thompson v. Coca Cola Co., 497 F. Supp. 2d 80, 96 (D. Mass. 2007), affd, 522 F.3d 168 (1st Cir. 2008) ("nitpicking ... does not constitute ... retaliation").
            As for the July 27-28 public meetings, Collins, "the administrative head" of the CCC, G.L. c. 10, § 760), gave O'Brien, the commission's Chair, just two business days' notice that he was moving up the start of his leave date. That O'Brien would be disturbed by and critical of such short notice, encourage Collins - even vociferously - to announce his intentions (and thus allow the commissioners to consider an interim or permanent replacement), and then notify her colleagues of the matter when Collins himself refused to do so, cannot be considered "outrageous" or "extreme" under any reasonable meaning applied to  those terms. The Treasurer's conclusion that O'Brien committed gross misconduct by raising her concerns in open session is also legally erroneous. As a deliberative government body, the CCC is subject to the Open Meeting Law, see G.L. c. 39, § 238; and Collins' impending leave gave rise to a circumstance in which the CCC might justifiably appoint an acting executive director. The statute expressly so says. See G.L. c. 10, § 760). The commissioners were not permitted, much less required, to address such issues in executive session without first making a statement on the record during an open session. See G.L. c. 30, § 2l(a)(listing limited circumstances when "a public body may meet in executive session"). See also Office of the Attorney General, Open Meeting Law Guide 11 (Jan. 2018 ed.) (prior to entering executive session, public body must
 
                                                            -35-
 
convene in open session and state the reason for the executive session).[33] Moreover, the extent of O'Brien's commentary was to express her displeasure that Collins had not provided adequate notice of his intended leave, a fact she believed created significant issues for the CCC. O'Brien nevertheless noted three separate times that she wanted to respect Collins' leave rights, and expressly emphasized that any further discussion of the matter should be held in executive session. The Treasurer's criticism that O'Brien failed to state clearly her support for this employee's leave rights is thus not only belied by the record, but implies an affirmative duty not based in the statute or even the CCC's Employee Handbook.[34]
            Lastly, even if O'Brien acted with personal animus toward the Executive Director, her conduct did not transgress any cognizable duty owed to Collins. Collins had no right to define the terms of his departure, and O'Brien did not disclose legally protected information merely by stating, even in an open meeting, that Collins intended to commence his parental leave the following workday. See Brogan v. School Comm. of Westport, 401 Mass. 306,308 (1987) ("dates and generic classifications" of employee's absences not protected under G.L. c. 4, § 7, Twenty-sixth (c)).[35] The Treasurer has never cited a legal basis either in the Decision, or in her
 
--------------------------------------------
 
[33] The Treasurer has never identified the basis upon which the Chair should have entered into executive session without first making a statement in predication of same in open session. The only plausible basis is set forth in G.L. c. 30, § 2 l(a)(l), which permits a public body to meet in executive session "[t]o discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual . . . "G.L. c. 30, § 21 (a)(1) (emphasis added). To the extent this provision even applies, O'Brien's stated concerns plainly went to Collins' professional competence -viz.,the inadequate notice of his leave-taking - and not his physical condition, mental health, etc. The law does not permit a body to discuss "professional competence" in an executive session without first discussing it in open session. See Board of Selectmen of W. Bridgewater v. Attorney Gen., 93 Mass. App. Ct. 1109, 2018 WL 2074469, *2 (May 4, 2018) (Rule 1:28), citing District Attorney for the N. Dist. v. School Comm. of Wayland. 455 Mass. 561, 569-70 (2009).
[34] Curiously, the Treasurer faults O'Brien for mentioning Collins' leave during the July 28 meeting, but then faults O'Brien again for not addressing him by name or his leave specifically during her August 10 apology. (A.R. at 6, 50- 52.)
[35] Nor can O'Brien's public reference to the fact that Collins would be taking leave in connection with the birth of a child (as distinct from, say, a personal illness or medical procedure) be considered a serious and substantial invasion of his privacy. See Bratt v. International Bus. Machines Corp.. 392 Mass. 508, 518 (1984) (statutory right against
 
                                                            -36-
 
briefing and argument before this Court - for the assertion that O'Brien violated any recognized privacy right by disclosing such a benign fact.
            The Treasurer argues repeatedly that, even if none of the foregoing incidents, standing alone,justificd O'Brien's removal as CCC Chair, the evidence against O'Brien must be viewed in its totality rather than in episodic isolation. The Treasurer thus argues that individual "[b]ricks of misconduct can [together] build a wall of gross misconduct." (Def.'s Opp., at 8.) But to extend this metaphor with an homage to the courtroom of cinema, the Treasurer's grounds for misconduct may look like bricks in shape, and edges and surface appearance. But viewed from any perspective other than the Treasurer's, these bricks are as thin as playing cards. Resting on walls constructed of same, the Treasurer's case for gross misconduct against O'Brien turns out to be just that: a house of cards. The cumulative evidence of record is that O'Brien once repeated someone else's use of the offensive term "yellow" to refer generally to persons of Asian descent; she made a few comments that implied race-based assumptions about who certain women of color might know; she commented to an investigator that an employee of color lacked an accent; she noted that certain other employees (of unidentified background) were articulate; she contributed to an admittedly fraught relationship with Commissioner Camargo; she occasionally yelled at and criticized Collins and O'Day; and she publicly expressed frustration that the CCC was in "chaos" or "crisis,"and that its Executive Director had not adequately notified the commissioners of his imminent plans to take leave. Nowhere, however, does the record reveal fraud, theft, abuse of trust, actionable discrimination or harassment, repeated refusal to perform required duties, acts or threats of violence, criminal offenses, or anything approaching the kind of egregious behavior our courts have ever recognized as "gross misconduct." O'Brien's
 
--------------------------------------------
 
invasion of privacy under G.L. c. 214, § 1B only proscribes disclosure of facts that are "highly personal or intimate" and where employer has "no legitimate, countervailing interest").
 
                                                            -37-
 
transgressions, even considered collectively, fall very far below that line.[36]
            Nor can the Treasurer cure the manifest deficits in her Decision by affixing labels like "outrageous," "flagrant" and "shameful" to a factual record that, as matter of law, simply cannot sustain commissioner removal under the controlling standard. While the substantial evidence test requires the Court to defer to the Treasurer's reasonable findings of fact and the fair inferences therefrom, Duggan v. Board of Registration in Nursing. 456 Mass. 666, 673 (2010), such deference does not extend to legal conclusions masquerading as facts. See Levy II, 436 Mass. at 748 ("Removal ... in the circumstances of this case is not a decision to which [additional] deference is accorded.").[37] Here, the  Treasurer's breathless characterizations of  O'Brien's actions as "outrageous" and the like - in the absence of substantial evidence supporting the same
- amount to mere proxies for her legal conclusion that O'Brien engaged in gross misconduct. The Treasurer cannot invoke such damning descriptors as a talisman to insulate an unjustified
 
--------------------------------------------
 
[36] The Treasurer's supplemental findings likewise fail to move the needle. Hearsay evidence may be considered in an agency adjudication only ifit bears "sufficient indicia of reliability." Doe v. Sex Offender Registry Bd., 95 Mass. App. Ct. 85, 89 (2019). But not here, as the hearing's Officiant supportably ruled. First, the Treasurer's conclusion that the anonymous witness statements are credible"because licensees and commissioners were concerned about retribution from CCC staff' stands logic and common sense on its head. Staff members' own perceived propensity for retribution cannot plausibly bolster their credibility, or somehow justify a desire for anonymity. Further, the inability to identify the source, the potential for declarants' improper motives (that is, the ability to submit to an interview without concern that the malign intentions underlying their statements would be revealed), and the lack of detail and independent corroboration are all classic indicia of unreliability. Id. at 89 90. To be sure, some of the events reported by these unidentified witnesses are corroborated through documentary evidence or in O'Brien's own admissions that she made certain statements - e.g., the "yellow" remark and the email suggesting a meeting with CCC hires in Boston. But to this extent, the cumulative anonymous accounts add virtually nothing of probative value to the record. Moreover, O'Brien's unrefuted testimony provided several perfectly rational reasons (unrelated to race and ethnicity) to propose a meeting in Boston. As to the Upham's Corner remark, the anonymous witnesses provided no context whatsoever to its making, raising concerns of unreliability and selective disclosure. In short, the Court does not find that the Treasurer reasonably considered this unattributed hearsay evidence. Regardless, and as noted ante, even if considered as part of the record, the fact that a number of employees claimed to have had negative interactions with O'Brien or perceived her comments to be racially insensitive is not, without more, objectively reliable evidence that O'Brien's conduct was in fact so outrageous or extreme to support removal under § 76(d)(4).
[37] See also Licensing Bd. for City of Boston v. Alcoholic Beverages Control Comm'n. No. CIV.A. 01-2136-G, 2003 WL 22383716, at *4 (Mass. Super. Oct. 6, 2003) (Hines, J.) ("The deference normally accorded to an agency decision on factual issues is not appropriate in reviewing questions of law."), citing Boston Police Super. Officers Fed'n v. Labor Relations Comm'n.,410Mass. 890, 892 (1991).
 
                                                            -38-
 
decision to remove O'Brien from judicial scrutiny. For§ 76(d) to have any meaning at all, the Court cannot rubber-stamp such conclusory assertions. See U.S. Gypsum Co. v. Executive Off. of Env't Affs., 69 Mass. App. Ct. 243, 253 (2007) ("principle of deference does not extend to judicial abdication," particularly where the agency's decision "is fundamentally at odds with overarching public policy").
            Shorn of rhetoric and hyperbole, the Treasurer's Decision attempts to stretch a modest number of unexceptional facts into a Procrustean bed of gross misconduct they simply cannot be made to fit. Our courts rightly recognize that "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins -thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Lazarra v. Wyle Elec., Inc., 56 Mass. App. Ct. 1112, 2002 WL 31694843, at *6 n.19 (Nov. 29, 2002), quoting Suarez, 229 F.3d at 54. Our laws are not meant to police "[m]inor ... employment skirmishes," Murray v. Warren Pumps. LLC, 821 F.3d 77, 87 (1st Cir. 2016), or "uncomfortable and tense working relationship[s]." Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 44-45 (1st Cir. 2011). Supervisors levy criticisms, voice concerns, and [gasp] even yell at subordinates. Brader v. Biogen, 983 F.3d 39, 63 (1st Cir. 2020).[38] Much more is required for legal consequences to attach to such behaviors. See ante.
            The Legislature, in setting the gross misconduct  standard,  did  not  depart from or alter these settled principles. To the contrary, it intended to  empower  the  CCC's commissioners to render policy and managerial decisions that might be unpopular (internally or externally) without
 
--------------------------------------------
 
[38] See Col6n-Fontanez, 660 F.3d at 44-45 (finding no evidence of hostile work environment, even where supervisor yelled at employee in front of others, threw employee out of office and refused to meet with her, and permitted others to make derogatory comments about her, as the "incidents described are episodic, but not frequent ... ; upsetting, but not severe; mildly humiliating, but not physically threatening"); Lee-Crespo v. Schering-Plough Del Caribe. Inc., 354 F.3d 34, 46-47 {1st Cir. 2003) ("[A] supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws.").
 
                                                            -39-
 
fear of termination. Perhaps more to the point, and as the cases repeatedly make clear, not all objectionable behaviors qualify as "gross misconduct." See Boston Med. Ctr. v. Service Emps. Int'l Union, Loc. 285,260 F.3d 16, 22 (1st Cir. 2001) (not every minor disciplinary offense provides just cause for termination); Keebler Co. v. Truck Drivers, Loc. 170. 247 F.3d 8, 13 (1st Cir. 2001) ("unacceptable disrespect" did not constitute "gross insubordination"). There exists a broad spectrum of conduct falling short of best practices and prevailing workplace standards that nonetheless does not descend to the dismissal-worthy level of gross misconduct. This is not to say that the Appointing Authorities must tolerate minor infractions of commissioners in perpetuity. The power to remove necessarily implies the lesser-included power to reprimand, discipline, or suspend when warranted. See McGonigle v. Governor, 418 Mass. 147, 151 (1994), citing Tobin v. Sheriff of Suffolk Cnty.. 377 Mass. 212,214 (1979); Multi-Line Ins. Rating Bureau v. Commissioner of Ins., 357 Mass. 19, 22 (1970). Indeed, had the Treasurer pursued a course of progressive discipline and had O'Brien defiantly persisted in the making of offensive comments to colleagues, the record might well permit an inference of malevolent or reckless intent rather than mere negligence and insensitivity.[39] But that did not occur.[40]
            That a commissioner may be occasionally abrasive, boorish, inconsiderate, ill-tempered, and even unreasonable with colleagues is not, without much more, sufficient grounds for her
 
--------------------------------------------
 
[39] It is well settled, in the analogous context of employee discharge under collectively bargained labor agreements, that an employer's failure to administer antecedent progressive discipline will often compel the reversal of a dismissal decision as lacking "just cause." See. e.g, Boston Sch. Comm. v. Serv. Emps. Int'l Union. Loe. 888, 71 Mass. App. Ct. I126, 2008 WL 2132821, at *2 (May 22, 2008) (Rule 1:28); Boston Med. Ctr., 260 F.3d at 22; Mirant Canal, LLC v. Local Union 369. No. CIV.A. 09-12216-DPW, 2010 WL 2900435. at *8 (D. Mass. July 22. 2010).
[40] While the CCC's Employee Handbook does provide that "bullying" may subject an offender to termination without progressive discipline, as discussed ante, that provision cannot be construed in a manner that is inconsistent with the plain language of§ 76(d)(4). Isolated acts, even if they qualify as "bullying," are not, in and of themselves, gross misconduct.
 
                                                            -40-
 
removal from office under G.L. c. 10, § 76(d)(4).[41] A Sword of Damocles does not hang over every commissioner who berates staff or makes foolish, tin-eared or even offensive remarks to them. If that were the case, the independence and discretion with which the Legislature intended to empower the CCC would be largely illusory.[42] The question before the Court is not whether O'Brien was a tactful or effective Chair. Nor is it whether O'Brien bears some measure of responsibility for the organizational dysfunction of which the CCC is widely reputed.[43] Nor is it whether the Treasurer was warranted in concluding that the CCC would benefit from a change in leadership. The decidedly different question presented, rather, is whether there exists substantial evidence to support the Treasurer's finding that O'Brien committed gross misconduct within the meaning of the statute. The record in this case does not remotely suffice.
III. INABILITY TO DISCHARGE THE DUTIES OF OFFICE
            O'Brien argues that the Treasurer further erred in concluding that O'Brien was "unable to discharge the powers and duties of [her] office." G.L. c. 10, § 76(d)(3). The Court agrees.
            As noted ante, this provision of the law is not defined in either Massachusetts statutes or decisional precedent. However, G.L. c. 10, § 76(d)(3) adopts, virtually verbatim, the language of
 
--------------------------------------------
 
[41] The Court implies no acceptance of these harsh characterizations of O'Brien, of course. But nor should this decision be read as an unalloyed adoption of 0 'Brien's equally self-serving characterization of events - viz., that she is a blameless "change agent" victimized by political chicanery -- a new chef brought in to rescue a failing restaurant, but then punished for breaking a few eggs. In applying the law, the Court takes no sides in these competing narratives. Rather, to transpose the culinary metaphor, the Court simply observes that the Treasurer's Decision places a lot of pots on the stove; but when the lids are lifted, they are revealed to be largely empty. Even when granting the Treasurer's fact-finding all the deference due it under the substantial evidence standard, and even considering the facts Goldberg found in their totality, her case for removal amounts to thin gruel.
[42] If, to pass muster, the CCC statute required no more than the threadbare evidence relied upon by the Treasurer and a slavish deference to the views of Appointing Authorities, little would be needed construct an autonomy-destroying case for dismissal against any dissident or unpopular commissioner.
[43] See, Diti Kohli, 'Where is the accountability?': Chaos at the Cannabis Control Commission leaves $7 billion pot industry in the lurch, Boston Globe (Aug. 7, 2024) available fil https://www.bostonglobe.com /2024/08 /07/ business/cannabis-commission-massachusctts-regulations/; Thomas Lee and Matt Stout, 'An endless stream of scandals': As chairless cannabis board meets, lawmakers push for oversight hearing, Boston Globe (Sept. 18, 2023) available fil https;//www.bostonglobe.com/2023/09/18/metro/legislature-over sight -hearing-cannabis-control - commission/? p1=Article_Inline_Text_Link.
 
                                                            -41-
 
the 25th Amendment to the U.S. Constitution, establishing succession in the event of "Disability of [the] President." See U.S. Const. amend. XXV, §§ 3, 4 (providing that, where the President "is unable to discharge the powers and duties of his office," the Vice President shall assume such powers and duties as Acting President). It is well settled among scholars that Congress intended these provisions to apply only to severe physical or mental incapacities of the chief executive, or to forms of protracted absence or duress.[44] "The purpose of enunciating such a high standard for inability ... [and, thus, removability] was to prevent a broad reading whereby 'when a President makes an unpopular decision, he would immediately be rendered unable to perform the duties of his office.'" Adam R.F. Gustafson, Presidential Inability and Subjective Meaning, 27 Yale L. & Pol'y Rev. 459,483 (2009), quoting 111 Cong. Rec. 15,381 (1965) (statement of Sen. Kennedy). Stated differently, the "unable" provisions of the 25th Amendment "were not intended to provide a no-confidence mechanism . . . "Joel. K. Goldstein, Celebrating the Presidential Inability Provisions of the Twenty-Fifth Amendment, 10 ConLawNOW 119, 133 (2019), citing John D. Feerick, The Twenty-Fifth Amendment: Its Complete History and Applications 104, 112 (3d ed. 2014). Consistent with this narrow construction of the term by legal historians, the particular events which precipitated enactment of the 25th Amendment,[45] and the (concededly limited)
 
--------------------------------------------
 
[44] Sec Joel. K. Goldstein, Celebrating the Presidential Inability Provisions of the Twenty-Fifth Amendment, 10 ConLawNOW 119, 133 (2019) (framers intended removal provisions to apply to "physical and mental inabilities ... [whether resulting from] trauma, attack, injury, illness, surgery (whether elective or not) or emotional factors or [ ] a degenerative process," and to "disabilities created by logistical problems, such as a missing Air Force One or a kidnapped chief executive or one lacking communication with government.");Adam R.F. Gustafson, Presidential Inability and Subjective Meaning, 27YaleL. & Pol'y Rev. 459, 481 (2009) ("The legislative record reveals that only severe disabilities - whether physical, mental, or as a result of capture - that render the President totally unable to communicate a rational decision comprised the expected applications of Section 4."), citing 111 Cong. Rec. 7938, 7941, 7947, 15,593 (1965) (statements of Reps. Celler, McClory and Poff, and Sen. Bayh), Presidential Inability: Hearings on H.R. 836 et al. Before the H. Comm. on the Judiciary, 89th Cong. 94, 141 (1965).
[45] Specifically, President Eisenhower suffered a heart attack, a stroke, and underwent a critical surgery while in office, and thereafter proposed a constitutional amendment addressing presidential inability. Joel K. Goldstein, The Bipartisan Bayh Amendment: Republican Contributions to the Twenty-Fifth Amendment, 86 Fordham L. Rev. 1137, 1141-42 (2017). Eisenhower also disclosed publicly a letter agreement with Vice President Nixon, allowing either to
 
                                                            -42-
 
instances in which the provision has actually been invoked since ratification, all involved concerns regarding a President's physical or mental capacity to fulfill the duties of office.[46]
            Several of our sister states have adopted the language of the 25th Amendment to establish the conditions for removal of a sitting governor. To the extent such provisions have been invoked, the courts are unanimous that physical or mental incapacity, extended physical absence from office, or the functional equivalent of same is required. See, e.g. In re Temp. Inability of Governor Frank L. O'Bannon to Discharge the Duties of Off., 798 N.E.2d 838,838 (Ind. 2003) (holding governor was "unable to discharge the powers and duties of his office" under Ind. Const. art. 5, § 10 when he suffered stroke and was comatose); State ex rel. Ashcroft v. Blunt, 813 S.W.2d 849, 855 (Mo. 1991) (Blackmar, J., concurring) (suggesting identical language in Missouri constitution should apply "in any case in which it is suggested that the governor is under disability"). Cf. Buchanan v. Gilmore, 139 F.3d 982, 983 (4th Cir. 1998) (holding purported conflict of interest did not render governor "unable to discharge the powers and duties of his office" under Va. Const. art. V, § 16).
            The Treasurer's Decision in the case at bar curiously bypassed any consideration of the 25th Amendment when interpreting G.L. c. 10, § 76(d)(3). Instead, the Treasurer purported to apply the plain meaning of"unable to discharge." (See AR. at 71), citing an Oxford English Dictionary Online (defining "unable" as "not having the ability or power to do or perform" or
 
--------------------------------------------
 
determine that Eisenhower was disabled, thereby triggering a transfer of presidential powers and duties to Nixon, which arrangement was largely followed by President Kennedy and Vice President Johnson. Id. at 1142. The assassination of President Kennedy renewed Congressional attention to the troublesome matter of presidential incapacity, leading directly to passage of the 251hAmendment.
[46] Presidents Reagan, George W. Bush and Biden invoked Section 3 (formally or informally) on a total of four occasions, each when undergoing anesthesia for a surgical procedure. See Karen L. Shanton, Presidential Disability Under the Twenty-Fifth Amendment: Constitutional Provisions and Perspectives for Congress (July 17, 2024), available at https://www.congrcss.gov/crs-product/R45394. Section 4 - authorizing the Vice President and a majority of [ ] the principal officers of the executive departments" to declare "that the President is unable to discharge the powers and duties of his office" - has never been invoked.
 
                                                            -43-
 
"lacking ability in some implied respect; incompetent; inefficient"; and defining "discharge" as "perform (a duty)"). The Treasurer concluded from these definitions that§ 76(d)(3) permitted her to remove "a commissioner who is incapable, unfit, or lacking in ability to perform competently the powers and duties of' the office. (AR. at 71.) The Treasurer then stated, in conclusory fashion, that (1) O'Brien was "incapable" of conducting herself in accordance with the Employee Handbook; and (2) O'Brien's comments "cast reasonable doubt" that the CCC was rendering unbiased decisions, and thus demonstrated that O'Brien was "incapable" of fulfilling the CCC's social equity mission. (A.R. at 72-73.) The Treasurer's errors in this regard were several and manifest.
            First, the Treasurer's analysis (ignoring the 25th Amendment altogether) reflects the very type of blinkered reasoning that our appellate courts have repeatedly denounced. See Graziano, 96 Mass. App. Ct. at 604; Hourican, 85 Mass. App. Ct. at 411. The Court may presume that legislators are familiar with the provisions of the federal Constitution, which they swear an oath to uphold. (U.S. Const. Art. VI, cl. 3.) See Commonwealth v. George W. Prescott Pub. Co. LLC, 463 Mass. 258, 266, (2012) ("We presume that the Legislature is familiar with existing laws when enacting a new statute[.]"). The Legislature's informed choice to adopt in§ 76(d)(3) language effectively identical to the 25th Amendment can neither be viewed as accidental, nor hand-waived away. The Treasurer offers no explanation why the Legislature adopted the language of the most prominent removal provision in American law but, without the slightest indication, intended a dramatically different meaning.[47]
 
--------------------------------------------
 
[47] Moreover, it bears note that the dictionary definitions upon which the Treasurer relied below are by no measure inconsistent with the interpretation of"unable to discharge" as referring strictly to physical or mental incapacity or a similar physical/ logistical inability, and by no means dictate a different result. (See A.R. at 71), quoting UNABLE, Oxford English Dictionary Online (defining "unable" as "not having ability or power[] to do or perform ... something specified"). To be sure, the cited dictionary includes "incompetent" and "inefficient" as subsidiary definitions for "unable;" but, for the reasons discussed infra, such a broad interpretation cannot be squared with the statutory scheme of G.L. c. 10, 76(d) or Levy II's holding regarding the meaning of''just cause" to remove an
 
                                                            -44-
 
            The Treasurer's "plain meaning" reasoning also ignores the structure, purpose, and history of G.L. c. 10,§ 76, which strongly reinforce the conclusion that the Legislature intended "unable to discharge ... " to be limited to physical or mental incapacity, extended physical absence, or the equivalent. The Legislature enacted§ 76(d)(3) as part of an overhaul of the statutory provisions governing appointment and membership of the CCC, which significantly narrowed the grounds for commissioner removal to five specific causes - (1) malfeasance in office; (2) substantial neglect of duties; (3) inability ["unable"] to discharge the powers and duties of office; (4) gross misconduct; and (5) felony conviction. G.L. c. 10, § 76(d). To be sure, these grounds are not mutually exclusive; and the Court can readily conceive of felonious activity or substantial neglect of duties that might also constitute malfeasance in office or gross misconduct, and vice versa. Nevertheless, where the four other subsections of statutory cause concern specified wrongdoing, applying the "25th Amendment definition" to the term "unable" in subsection (3) gives meaning to each provision of§ 76(d) without rendering any of them mere surplusage.
            By contrast, the Treasurer's malleable and open-ended interpretation of"unable to discharge" effectively permits removal when an Appointing Authority deems a commissioner's job performance to be inadequate or, as in this case, based on a forecast that her performance will be ineffective in the future. Such a broad reading of this provision renders the four other narrower subsections of the definition duplicative and, therefore, a virtual nullity, a decidedly disfavored construction of a statute. See City Elec. Supply Co., 481 Mass. at 790 ("The canon against surplusage is strongest when an interpretation would render superfluous another  part of the same statutory scheme."). Additionally, the Treasurer's reading of"unable to discharge"
 
--------------------------------------------
 
independent administrator.
 
                                                            -45-
 
renders§ 76(d)(3) all but indistinguishable from the "for cause" termination provision operative under G.L. c. 30, § 9, the less exacting standard the Legislature unambiguously rejected in its 2017 amendments to the statute. Last, and most significantly, the Treasurer's interpretation of "unable to discharge" eviscerates the independence which the Legislature deemed essential to the CCC's design. For it permits the very type of "no confidence" mechanism for commissioner removal that the 25th Amendment, on which it was modeled, was enacted to preclude. This, too, is contrary to settled canons of statutory construction. See Rossetti, 489 Mass. at 593 (meaning of statutory terms may be "derive[d] ... from sources presumably known to the statute's enactors"); Marengi, 491 Mass. at 25 (terms should be read "to give full effect to the expressed intent of the Legislature").
            Inasmuch as G.L. c. 10, § 76(d) was enacted to curtail the Treasurer's power to remove CCC commissioners, this is not a circumstance in which her broad interpretation of the removal provision warrants judicial deference. See Levy II, 436 Mass. at 748. Regardless, the Treasurer's interpretation of§ 76(d)(3) does not comport with any fair reading of the statute and, therefore, constituted a clear error of law. See Commercial Wharf E. Condo. Ass'n v. Department of Env't Prat., 99 Mass. App. Ct. 834, 841 (2021) (administrator's "erroneous interpretation of a statute ... is not entitled to deference"). Stated otherwise, the statute docs not authorize (as it could have) the removal of a commissioner who merely fails to meet the expectations of her Appointing Authority, a standard premised on perceived failures of job performance. The statute instead permits removal only in the much narrower circumstance where the commissioner is "unable to discharge" the "powers and duties" of her office, a standard premised on an actual lack of capacity. Inasmuch as there is no evidence that O'Brien was physically or mentally incapacitated, or otherwise physically "unable to discharge the powers and duties" of her office,
 
                                                            -46-
 
the facts of record cannot justify her removal under§ 76(d)(3).
            Finally, even assuming, arguendo, that§ 76(d)(3) provides some broader, performance- based ground for removal, the Treasurer's conclusion that O'Brien was unable to perform her duties is not supported by substantial evidence. The Treasurer below speculated, based on the vague and undefined "collegiality"and anti-"bullying" provisions of a personnel manual, that O'Brien was "incapable" of conducting herself in accordance with the Employee Handbook. Such a conclusion might be plausible if, prior to her suspension and termination, O'Brien had been notified of her offending conduct but refused or failed to correct it despite being afforded a reasonable opportunity to do so. O'Brien, however, was never the subject of such progressive discipline. (Indeed, when the Treasurer flagged O'Brien's conduct during the CCC commissioners' July 28, 2023 meeting, O' Brien issued an apology at the subsequent public meeting- albeit not to the Treasurer's satisfaction.) The Treasurer's  broad  interpretations of these anti-bullying and collegiality provisions likewise appear to conflict with - or at least visit a chilling effect upon - the Chair' s statutory responsibility to ensure that the commission performs efficiently and capably. Setting such policy conflicts aside, the fact that a commissioner has a contentious, or even hostile, relationship with subordinates does not perforce demonstrate that she "is unable to discharge the powers and duties of the commissioner's office," even under the broadest construction of those words the English language might allow. It is simply inconceivable that the Legislature could have intended to authorize the Treasurer to remove the CCC's Chair for purportedly being too demanding of its staff.
            The Treasurer's Decision further maintained that O'Brien's actions gave rise to "reasonable doubt" as to whether O' Brien and the CCC she led were capable of fulfilling the commission's social equity mission. This conclusion is both wholly speculative and
 
                                                            -47-
 
insufficiently supported. There was no evidence whatsoever, and no finding by the Treasurer, that O'Brien ever exhibited racial animus in her remarks, much less in her official decision- making. To the contrary, the undisputed evidence is that O'Brien was fully committed to the CCC's social equity mission - indeed, O'Brien's most notorious offense in this regard (her reference to persons of Asian national origin as "yellow") occurred while she was advocating/or greater efforts to advance the CCC's social equity mission. Rather than requiring an actual "substantial neglect of duties," see G.L. c. 10, § 76( d)(2), and instead turning a blind eye to evidence that clearly belies her suppositions, the Treasurer contends that§ 76(d)(3) somehow permits commissioner removal based on conjectural concerns regarding public confidence in the agency head's future performance in the realm of social equity. The essence of agency independence, however, is the ability to act free from the vicissitudes and vagaries of public opinion. See Levy II, 436 Mass. at 748. Removal of a commissioner based on the public's putative lack of faith - indeed, based on even more speculative forecasts of diminished public confidence in the agency's future performance - is anathema to such a statutory design.
            For all the foregoing reasons, the Treasurer's Decision removing O'Brien was not supported by substantial evidence, and reflects material errors of law that are apparent on the record. As such, the Decision must be vacated.
IV. REMEDY
            The standard remedy for a wrongful termination of employment is reinstatement, together with back pay and benefits (retroactive to the date of termination). See Thompson v. Civil Serv. Comm'n, 90 Mass. App. Ct. 462, 471 (2016).[48] However, a party is not entitled to reinstatement
 
--------------------------------------------
[48] The law does not permit the assessment of prejudgment interest against the Commonwealth or its instrumentalities where. as here, there is no indication that the Legislature intended to waive sovereign immunity to such liability either by express statutory language or by "necessary implication." See DeRoche v. Massachusetts Comm•n Against Discrimination, 447 Mass. I, 12-13 (2006) ("Absent statutory language that indicates by express terms a waiver of
 
                                                            -48-
 
beyond an established end date of term employment. School Comm. of City of Bos. v. Cramer, No. 1984CV2593E, 2020 WL 5993091, at *5 (Mass. Super. Aug. 5, 2020) (Sullivan, S., J.). Here, the CCC statute provides that commissioners shall serve a five year term. See G.L. c. 10, § 76(c). To the extent a seat becomes vacant mid-term, the newly appointed commissioner shall serve the remainder of "only the unexpired term" of his/her predecessor. Id. The clear intent of these statutory provisions is that each commissioner's seat will be subject to appointment/ reappointment in five-year increments. O'Brien assumed her duties on September 1, 2022. She was placed on a paid suspension on September 14, 2023, and then removed entirely from office on September 9, 2024. O'Brien is thus entitled to reinstatement to complete the unexpired remainder of her term, through August 31, 2027,[49] and to back pay and benefits running from the date of her wrongful removal from office.
CONCLUSION AND ORDER
            For the foregoing reasons, Plaintiff Shannon O'Brien's Motion for Judgment on the Pleadings is ALLOWED, and the Cross-Motion for Judgment on the Pleadings of Defendant Deborah Goldberg, in her official capacity as Treasurer and Receiver General of the Commonwealth of Massachusetts, is DENIED. The Treasurer's Decision shall be, and hereby is, VACATED.
            Plaintiff shall be reinstated to her position as Chair of the Cannabis Control Commission, effective immediately and without further delay,[50] and shall serve out the balance of her
 
--------------------------------------------
 
sovereign immunity, the Legislature's intent to subject the Commonwealth to liability may be found only when such an intent is clear by necessary implication from the statutes terms." [internal quotation omitted]).
[49] Any remedy not including reinstatement would plainly frustrate the statutory scheme. The intent of § 76 is not merely to provide job security to CCC commissioners, but, as important, to secure for the public the benefit of their independent decision-making for the duration of their statutory appointments.
[50] Ordinarily, the Court reserves judgment on whether to issue a stay of judgment pending appeal until a party has moved therefor. In this case, however, the interests of justice compel the Court to address the futility of such a
 
                                                            -49-
 
original five-year term expiring on August 31, 2027. Plaintiff shall additionally be entitled to an award of all due back pay and benefits from the date of her wrongful removal as Chair.
            Judgment shall enter in favor of the Plaintiff and against the Defendant in accordance with the terms hereof.
SO ORDERED.
/s/Robert B. Gordon
Justice of the Superior Court
September 2, 2025
 
--------------------------------------------
 
motion without delay. A litigant seeking a stay pending appeal most demonstrate: (1) a likelihood of success of its appeal on the merits; (2) a likelihood of irreparable harm if the Court denies the stay; (3) the absence of substantial harm to the other party if the stay issues; and (4) the absence of harm to the public interest from granting the stay C.E. v. J.E., 472 Mass. l016, 1017 (2015), citing J.W. Smith & H.B. Zobel, Rules Practice § 62.3, at 409 (2d ed. 2007). As the case at bar does not present as a close one, the Court does not foresee that the Treasurer is reasonably likely to succeed on the merits of an appeal. Sec Commonwealth v. Nash, 486 Mass. 394, 403 (2020) ("likelihood of success" requires "some reasonable possibility of a successful decision in the appeal"). As to the second prong, the Court acknowledges that restoring O'Brien as Chair may cause some short-term disruption to the operations of the CCC. Such transitional harm to the CCC, however, pales in comparison to the more substantial harm to O'Brien and the public that would result from further delay. O'Brien has not actively served as CCC Chair for two years while this Dickensian drama played out; and, while monetary damages may compensate her for lost salary and benefits, she is irreparably harmed each day she is deprived of the ability to exercise the powers of the Chair for the duration of her term of appointment. Moreover, the public would be irreparably harmed if, regardless of the invalidity of a commissioner's removal, the law nonetheless permitted the Appointing Authorities simply to run out the clock on the commissioner's term, and thereby deprive the public of the independent leadership central to the CCC's design. There will be no stay, from this Court, of O'Brien's reinstatement to CCC leadership.